[627 NYS2d 1008]

Michael Califano, Respondent, v City of New York, Appellant.

First Department, June 8, 1995

### APPEARANCES OF COUNSEL

*Norman E. Frowley* of counsel, New York City *(Edwin N. Weidman,* attorney), for respondent.

*Stephen J. McGrath* of counsel, New York City *(Kathleen Alberton* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for appellant.

### OPINION OF THE COURT

SULLIVAN, J. P.

The City appeals from the setting aside of a verdict in its favor in a personal injury action brought against it by a Department of Sanitation worker who fell while cleaning a collection truck at a Department garage. The focal point of the factual contentions at trial was the way in which the accident occurred, plaintiff claiming he fell from a ladder set on a defective floor while the City contended that, in violation of a Departmental directive requiring the use of ladders in such situations, plaintiff, in fact, never used a ladder and had, without any fault on the part of the City contributing thereto, fallen from the truck. The jury returned a unanimous negative vote to the question, "Did the plaintiff, Michael Califano, fall from the ladder on June 29, 1988?" and, in accordance with the court's instructions, ceased deliberations and reported the verdict. Since the jury correctly saw this case for what it was, an attempt to defraud the City, and no grounds existed for setting aside the verdict, the order granting the same should be reversed and the verdict reinstated.

A brief summary of the relevant testimony illustrates the point. On June 29, 1988, at approximately 2:00 A.M., plaintiff fell, allegedly from an eight-foot ladder, while washing a collection truck at the Department of Sanitation's Manhattan East 8 Garage, thereby sustaining a fracture of the wrist. Plaintiff testified that he placed the ladder against the back of the truck at midpoint. Although there was a drain in the vicinity, as a result of an accumulation of water on the floor he was not able to observe either the drain or the location of any of the floor's ruts or crevices. For at least two years, he

had been aware that the floor area near the drain had been pocked by ruts and cracks.

Plaintiff testified that before ascending the ladder he made sure it was steady. Wearing rubber boots with metal shanks and corrugated soles, he climbed to the top rung and stood with his feet in a parallel position two feet apart. Plaintiff cleaned the right side of the truck for approximately five minutes. The ladder showed no signs of instability. Upon completing the right side of the truck, plaintiff inched his way over to the left side of the rung in order to clean that side of the truck. He testified that he worked on the left side of the truck for approximately five minutes when the ladder, due to a pothole or depression, shifted to the right, causing him to lose his balance and fall. In his deposition testimony, read in evidence, plaintiff testified that he felt the ladder slip to the right "going down into the pothole" and he fell over.

After plaintiff fell, another Department of Sanitation employee, Bobby Brunetti, whom, according to plaintiff, he had known for two years before the accident and had worked with both as a refuse collector and utility worker, helped him up and brought him to their supervisor. Brunetti was allegedly standing only five feet away at the time and, according to plaintiff, informed him that he had witnessed the accident. Brunetti confirmed this fact in a written statement—placed in evidence—given two months later to a private investigator. A foreman subsequently drove plaintiff to New York Hospital, where he was treated for his injuries.

On the City's case, Patricia Sweeney, a triage nurse in the emergency room of New York Hospital, testified that, after interviewing plaintiff, she noted on his emergency room record that he "fell off sanitation truck and cut [right] elbow and cannot move [right] wrist." Had plaintiff indicated the use of a ladder, Nurse Sweeney testified, she would have noted the fact and been quite specific about the height of the ladder. Nicholas Eadicicco, a retired Department of Sanitation employee and plaintiff's supervisor at the time in question, testified that, after reporting the accident, plaintiff took him to the accident site. Plaintiff showed Eadicicco the ladder from which he allegedly fell. The ladder was erect. Eadicicco observed the floor area where the accident occurred and noted that, while wet, there was no accumulation of water and, although there were sections of the wash area that had ruts and cracks, there were no potholes.

It should be noted that on October 18, 1993, in his opening statement, plaintiff's counsel stated that a co-worker, Brunetti, was an eyewitness and would testify. On October 20, 1993, outside the presence of the jury, plaintiff's counsel informed the trial court and defense counsel that on the evening of October 19, 1993, Brunetti, who was to testify the following day, telephoned plaintiff and demanded $50,000 in return for his testimony. Plaintiff had immediately informed his attorney, who recommended that plaintiff call back and tape the conversation. Plaintiff did so and, without Brunetti's knowledge, recorded their conversation which, insofar as pertinent, is as follows:

"CALIFANO: What's up? * * *

"BRUNETTI: Why don't we just get me out of this * * * case

"CALIFANO: How?

"BRUNETTI: I don't know how Mike * * *

"CALIFANO: All right, let me find out.

"BRUNETTI: Yeah, call [your attorney of record] or the other guy * * *.

"CALIFANO: Yeah

"BRUNETTI: and get me out of this

"CALIFANO: Why, what's wrong

"BRUNETTI: Nothin[g's] wrong, what's wrong, you know, between you, between my wife, you know what I'm saying, you know

"CALIFANO: All right, I understand what [you're] saying, but I don't know if there is a way, if there, wait listen to me,

"BRUNETTI: Yeah

"CALIFANO: If there isn't a way

"BRUNETTI: Yeah

"CALIFANO: Right, I told you this is between me and you

"BRUNETTI: Yeah

"CALIFANO: We'll come to a decent figure, you're not going to get hurt

"BRUNETTI: Mike, I told you a figure

"CALIFANO: Yeah, but come on Bobby, don't you think it's a little ridiculous

"BRUNETTI: OK., well

"CALIFANO: I don't even know what I'm getting, would you do, would you agree to that if you were in my shoes?

"BRUNETTI: Yes I would

"CALIFANO: If you knew, you, you didn't know what you were getting

"BRUNETTI: I know I'm getting two or three hundred thousand, yes I would, Mike

"CALIFANO: That's fifty thousand, how, tell me how much you want again

"BRUNETTI: Fifty

"CALIFANO: Just for goin' in * * *

"BRUNETTI: That's it, for lying Mike, not for going, just for lying * * *

"CALIFANO: Well, all right, what do you want me to do? You want me to get you out of this?

"BRUNETTI: Get me out, cause if I have to go down tomorrow

"CALIFANO: Yeah

"BRUNETTI: I'm gonna tell them I don't remember nothin'

"CALIFANO: OK

"BRUNETTI: If I get subpoenaed, you know this is bull shit, you know I, you know I'm married to my wife * * *

"BRUNETTI: You know, two, three thousand dollars goodbye Bobby, you know what I'm saying, I have to live with my wife the rest of my life

"CALIFANO: All right, so maybe more".

The taped conversation was played to the jury, without objection.

The court indicated that when Brunetti appeared to testify it would advise him of his constitutional rights; the court also notified the Department of Sanitation's Inspector General about the situation. The trial continued. On Friday, October 22, 1995, an Inspector General investigator interviewed Brunetti, who confessed that at plaintiff's request he had agreed to give false testimony at plaintiff's trial as to the circumstances of the accident. In pertinent part, Brunetti stated:

"I never saw the accident involving Michael Califano which occurred in July of 1988.[*] * * *

"Several weeks after the accident, Mr. Califano approached me and told me that he would be suing the city and asked if I would assist him by testifying falsely that I witnessed the accident. I agreed to give false testimony in furtherance of his

---

* As noted, the accident in issue occurred on June 29, 1988.

lawsuit, at which time Mr. Califano said he would 'take care of me.' No monetary amount was mentioned at this time. Mr. Califano said that an investigator would be coming to take a statement from me and that there are certain things he wanted me to say. Mr. Califano asked me to say that he was using a ladder at the time he was washing the truck, when in fact he was climbing on the truck, not using a ladder. * * *

"Several weeks prior to today's date, Mr. Califano approached me and told me the case was going to court and told me he would need my false testimony. I agreed, at which time Mr. Califano again said that he would 'take care of me.' I understood this to mean that Mr. Califano would be paying me an amount of money to give false testimony in court.

"On the evening of either Sunday, Monday or Tuesday, October 17, 18 or 19, 1993, I received a telephone call at my house from Califano asking me to testify. I told Califano that I wanted $50,000 for lying in court. Mr. Califano said the price was too high at which time I told him I wanted out of the agreement."

This statement was never placed before the jury.

On October 27, 1993, the City called Brunetti to testify. After conferring with an attorney from the 18-B Criminal Defense Panel, whose appearance had been arranged by the court, Brunetti advised the court that he would not answer any incriminating questions. After stating that he was presently employed by the City of New York, Brunetti was asked three questions: whether he was working for the City on June 29, 1988; if, on that date, he witnessed an accident involving plaintiff; and whether plaintiff approached him and asked him to give false testimony. Brunetti refused to answer any of the questions, stating that he was doing so on the advice of counsel, and was excused.

At plaintiff's request and over defense counsel's objection or indeed without ever permitting him to make a proper record as to his objection, the court, at that time, charged the jury: "Any witness who appears and who refuses to answer, you are entitled to exercise your right to, as judges of the facts, as triers of the facts, to have an adverse inference, simply because they refuse to testify." The City's motion for a mistrial was denied.

In his summation, defense counsel argued primarily that plaintiff was injured not from a fall from a ladder but rather as a result of his own negligence in attempting to wash the

truck without the benefit of a ladder. He also argued that, based on the taped conversation between plaintiff and Brunetti, the jury could infer that plaintiff and Brunetti were involved equally in the making of a false statement and that Brunetti's initial statement to the investigator relating his eyewitness account of the accident was false. As counsel put it, "Bobby Brunett[i] is in trouble because of his tape and Mr. Califano is in up to his ears for the same reason". As to Brunetti's statement, defense counsel made the following argument to the jury: "Now, Mr. Brunett[i] in this statement says he was a witness. Now, Mr. Brunett[i] did not testify. He chose not to testify on advice of a criminal attorney who was here, and we all heard the tape and I'm going to play it in a second. This statement is not true. I'm going to read it * * * parts of it, and tell you why it is not true." In its charge-in-chief, the court instructed the jury that Brunetti's "refusal to testify before you gives rise to an inference in favor of [plaintiff's] position."

Plaintiff moved to set aside the verdict, arguing, *inter alia,* that the "flagrantly prejudicial repetitious behavior of defense counsel throughout [the] trial and especially during summation coupled with the *first* interrogatory of the [v]erdict [s]heet, which focused the jurors' attention on one issue deprived [p]laintiff of a fair trial" (emphasis in original). In its decision, the trial court, *sua sponte,* raised the issue of whether plaintiff was deprived of a fair trial by defense counsel's summation comments regarding Brunetti's assertion of his Fifth Amendment privilege. The court questioned defense counsel's calling Brunetti as a witness, knowing that he intended to assert his constitutional right to remain silent, and imputed an improper motive to defense counsel's unobjected-to summation comment that Brunetti refused to testify on the advice of a "criminal" attorney. The court concluded that defense counsel's comments were aimed at "inviting the jury to conclude that because [Mr. Brunetti] availed himself of his constitutional privilege, this was proof of a scheme of fraud and subornation of perjury concocted between plaintiff and his witnesses." The court also found instances of defense counsel's vouching and interjection of his own unsworn statements of personal knowledge of facts of the case. The court, finding it had been rendered academic, never reached the issue of plaintiff's challenge to jury interrogatory number 1.

The issue of defense counsel's misconduct in summation raised by plaintiff in his postverdict motion to set aside the

verdict is unpreserved. Having failed to move timely for a mistrial on the basis of defense counsel's alleged misconduct in arguing that Brunetti's assertion of his constitutional privilege against self-incrimination and his taped conversation with plaintiff was evidence of a conspiracy between him and plaintiff to defraud the City, plaintiff's counsel may not belatedly complain about such conduct. *(Mathews v Coca-Cola Bottling,* 188 AD2d 590, 591; *Kamen v City of New York,* 169 AD2d 705, 706.)* "Counsel may not be permitted to speculate upon whether a verdict will be favorable, before asserting a claim for a mistrial. Such a motion must be made in advance of the verdict." *(Schein v Chest Serv. Co.,* 38 AD2d 929.)

Nor, in the circumstances presented, should the court have, *sua sponte,* addressed the issue. CPLR 4404 (a) provides that a trial court, upon motion of any party or on its own initiative, may set aside a verdict and order a new trial "in the interest of justice." The question for resolution on such a motion is "whether substantial justice has been done [or] whether it is likely that the verdict has been affected [citation omitted]." *(Micallef v Miehle Co.,* 39 NY2d 376, 381; *see also,* 4 Weinstein-Korn-Miller, NY Civ Prac ¶¶ 4404.11, 4404.12.) Put simply, the record does not support the trial court's conclusion that defense counsel's conduct deprived plaintiff of a fair trial. In making the determination to set aside a verdict and order a new trial "in the interest of justice", the trial court should look to its " 'own common sense, experience and sense of fairness rather than to precedents in arriving at a decision' ". *(Micallef v Miehle Co., supra,* at 381, quoting 4 Weinstein-Korn-Miller, NY Civ Prac ¶ 4404.11.) Once the tape recording of plaintiff's conversation with Brunetti, his prospective fact witness, was introduced in evidence and Brunetti, invoking his Fifth Amendment privilege, refused to testify, any rational trier of the facts could reasonably conclude that plaintiff and Brunetti had conspired to give false testimony and that plaintiff had suborned Brunetti for that purpose. These two related events were certainly an appropriate subject for comment in summation.

The trial court was of the view that defense counsel overstepped the bounds of fair advocacy by suggesting to the jury in summation to draw an adverse inference against plaintiff by virtue of Brunetti's exercise of his Fifth Amendment privilege. Defense counsel, however, was well within his rights in commenting as he did on the inference to be drawn from Brunetti's assertion of his Fifth Amendment rights. The infer-

ence to be charged in a civil case by a witness's invocation of the privilege against self-incrimination is "akin to that arising when a party fails or refuses to produce a material witness who is within his control" *(Marine Midland Bank v Russo Produce Co.,* 50 NY2d 31, 42, citing Richardson, Evidence § 534 [Prince 10th ed]). Such nonproduction "may be considered by a jury in assessing the strength of evidence offered by the opposite party on the issue which the witness was in a position to controvert" *(supra,* at 42; People v Rodriguez, 38 NY2d 95, 101).

Here, Brunetti was, in fact, plaintiff's witness, and it was plaintiff, not the City, who would be expected to call him. After all, Brunetti, plaintiff's friend for at least seven years at the time of trial, was under plaintiff's control and, as had been heralded, was to give testimony favorable to him. In his opening, plaintiff's counsel had told the jury that Brunetti was an eyewitness to the accident and would testify at trial, and plaintiff himself testified that Brunetti was standing nearby when the accident occurred and had told him that he had witnessed the accident. Indeed, as part of his case, plaintiff had placed in evidence Brunetti's August 31, 1988 written statement that at the time of the accident he saw the ladder on which plaintiff was standing "slip on a pot hole" and that the ladder fell in one direction while plaintiff fell in the other. Ultimately, plaintiff did not call Brunetti, whose appearance at the trial was derailed by his demand of a $50,000 payment, not for testifying, but for lying as to the manner in which the accident occurred. Thus, any adverse inference should have been charged to plaintiff, not the City, for not calling Brunetti. *(See, People v Gonzalez,* 68 NY2d 424, 427.)

Also proper was defense counsel's argument to the jury that on the basis of Brunetti's assertion of his Fifth Amendment rights and the taped October 19, 1993 telephone conversation between Brunetti and plaintiff, Brunetti's statement that he had witnessed the accident was false. Clearly, as already noted, a reasonable interpretation of the recorded dialogue between plaintiff and Brunetti supports the conclusion that they were involved in a fraudulent scheme to defraud the City. Significantly, when plaintiff, in that conversation, reaffirmed Brunetti's $50,000 demand, he asked, "Just for goin' in", to which Brunetti replied, "That's it, for lying Mike, not for going, just for lying." It is well settled that counsel had wide latitude in presenting their arguments to a jury in summation. *(See, McDonald v City of New York,* 172 AD2d

296, 297, *lv denied* 78 NY2d 861; *Laniado v New York Hosp.,* 168 AD2d 341, *lv denied* 78 NY2d 853; *Sherman v Ashkinazy,* 157 AD2d 451.)

Nor was there anything improper, as the trial court suggested, in the City's calling Brunetti as a witness. The City, armed with Brunetti's October 22, 1993 statement to the Inspector General that plaintiff had asked him after the accident to testify falsely as to its happening, for which plaintiff would " 'take care of [him]' ", could hope that Brunetti would testify consistently and support its position. At worst, if Brunetti were to assert his Fifth Amendment privilege, as he did, the City might have, although it never attempted to do so, offered his October 22, 1993 statement for its truth as a declaration against penal interest. *(See, People v Brown,* 26 NY2d 88.)

In no sense, however, given the background of Brunetti's involvement, which was fully known to the court, should the City's decision to call Brunetti and his subsequent invocation of his Fifth Amendment rights redound to the benefit of plaintiff by giving an adverse inference charge against the City. In the circumstances presented here, such a charge tends to pervert the trial's truth-seeking function and ignores the evidence's clear implication of a conspiracy. Fortunately, misguided adverse inference charge notwithstanding, that evidence was not lost on the jury.

We have examined plaintiff's other claims of adversarial excesses in the City's summation and find them to be without merit. Defense counsel's conduct in pointing out the contradictory and inadequate nature of plaintiff's proof was well within the broad bounds of rhetorical comment. Nor, in the circumstances presented, was there anything improper about jury interrogatory number 1. The entire case turned on the resolution of that single issue.

Accordingly, the order of the Supreme Court, New York County (Salvador Collazo, J.), entered on or about December 27, 1993, granting plaintiff's motion to set aside the verdict and directing a new trial, should be reversed, on the law, without costs or disbursements, the motion denied and the verdict reinstated.

ROSENBERGER, WALLACH, KUPFERMAN and TOM, JJ., concur.

Order, Supreme Court, New York County, entered on or about December 27, 1993, which granted plaintiff's motion to set aside the verdict and directed a new trial, reversed, on the law, without costs or disbursements, the motion denied and the verdict reinstated.