[888 NYS2d 372]

In the Matter of ANDREW CAROTHERS, M.D., P.C., Plaintiff, v IN-SURANCE COMPANIES Represented by BRUNO, GERBINO & SO-RIANO, LLP, et al., Defendants. (And Other Cases Joined for Trial.)

Civil Court of the City of New York, Richmond County, October 14, 2009

450

**APPEARANCES OF COUNSEL**

*Smith Valliere & Martinez PLLC*, New York City (*Mark W. Smith* of counsel), for plaintiff. *John E. McCormack, P.C.*, Garden City, and *Freiberg & Peck, LLP*, New York City (*Craig J. Freiberg* of counsel), and *Bruno, Gerbino & Soriano, LLP*, Melville (*Vincent F. Gerbino* of counsel), and *Rivkin Radler, LLP*, Uniondale (*Barry I. Levy* of counsel), for defendants.

**OPINION OF THE COURT**

PETER P. SWEENEY, J.

Following a jury verdict for defendants on their defense that plaintiff, Andrew Carothers, M.D., P.C., was fraudulently incorporated within the meaning of *State Farm Mut. Auto. Ins. Co. v Mallela* (4 NY3d 313 [2005]), plaintiff moves pursuant to CPLR 4404 (a), and in the interests of justice, to set aside the verdict, to enter a verdict in its favor and/or for a new trial on the grounds that: (a) the court improperly instructed the jury on fraudulent incorporation; (b) the court's decision to charge the jury, and the specific contents of the charge concerning whether Dr. Andrew Carothers practiced medicine was erroneous; (c) the court erred in permitting the jury to consider and draw adverse inferences against the plaintiff due to Irina Vayman's and Hillel Sher's refusal to testify on Fifth Amendment grounds; and (d) the court made a myriad of erroneous evidentiary rulings favoring defendants.

### I.

### Factual Background

A. Introduction

Plaintiff is a professional service corporation that was engaged in the practice of medicine. Dr. Andrew Carothers, a board certified radiologist, was listed on all the plaintiff's corporate filings as the sole shareholder, and the only officer and director. While in practice, the corporation operated several radiology facilities in the City of New York where it performed magnetic

resonance imaging scans (MRIs) for patients that were allegedly injured in automobile accidents. The vast majority of these patients were entitled to reimbursement for the cost of the MRI services from insurance companies and self-insured entities under New York's No-Fault Law (Insurance Law § 5101 *et seq.*). Under the No-Fault Law, a person injured in a motor vehicle accident is entitled to recover first-party benefits, which *includes* reimbursement for medically necessary medical services, regardless of who was at fault in causing the accident.

Typically, when plaintiff provided MRI services for a patient, the patient assigned his or her entitlement to collect first-party benefits to the plaintiff. Plaintiff would then submit a claim for the services to the insurance company or self-insured entity that it believed was responsible for its payment. In all the actions that have been joined for trial, plaintiff is seeking to recover on claims for assigned first-party benefits.

The defendants in these actions are insurers and self-insured entities to whom plaintiff submitted claims. In many of the actions, particular defenses were asserted that applied to the particular action. In all of the joined actions, however, the defendants assert the defense that plaintiff was fraudulently incorporated within the meaning of the Court of Appeals' landmark decision in *Mallela* and is therefore not entitled to reimbursement of first-party benefits under the No-Fault Law.

B. The Trial

Defendants' contention that plaintiff was fraudulently incorporated centered on two theories. First, defendants maintained that plaintiff operated in violation of Business Corporation Law §§ 1507 and 1508 in that Hillel Sher and Irina Vayman, neither of whom was a licensed physician, actually owned and controlled the corporation. Second, the defendants maintained that Dr. Carothers was not engaged in the practice of medicine while he was associated with the plaintiff, which is also a violation of Business Corporation Law § 1507.

During the trial, defendants introduced compelling evidence supporting both theories. Defendants demonstrated, among other things, that when the corporation was formed, Dr. Carothers made absolutely no monetary investment in the corporation. Indeed, at the time, Dr. Carothers was in dire financial straits. He owed considerable back taxes and his home was under threat of foreclosure.

Defendants demonstrated that all the equipment used by the plaintiff, including the MRI machines, was leased to the plaintiff

from Forum Medical Management, Inc., a company that was owned and controlled by Sher. These leases required the plaintiff to pay exorbitant rates for the equipment. It was through these leases that the bulk of plaintiff's profits were channeled to Sher. For example, one of the MRI machines was being leased to the plaintiff for $75,000 per month. Sher, through his company, was leasing this machine from another company at a rate of only $5,950 per month. Another MRI machine, which had been purchased outright by Sher in April 2000 for $240,000, was being leased to the plaintiff four years later at an annual cost of $900,000. One expert testified that the total cost for all the equipment that the plaintiff used in its operations, including the cost of installation, would have been less than eight months of rental payments that the corporation had committed to pay to Sher's company for a single MRI machine. Indicative of the ridiculous rental fees that plaintiff had committed to paying Sher was a $500 monthly rental fee for a fax machine.

Neither Dr. Carothers nor the plaintiff corporation was a named tenant on any of the leases for the various premises where plaintiff did business. The named tenant on all the leases was MRI Global, another company controlled by Sher. It was Sher who signed the leases on MRI Global's behalf.

Plaintiff's day-to-day operations were run by Irina Vayman, with minimal to no input from Dr. Carothers. Even though her salary was supposed to be only $120,000 per year, the evidence indicated that she was actually paid $575,000. Other than Vayman, Dr. Carothers had no real dealings with the employees of the corporation. Everyone who worked at plaintiff's facilities was already working at them before plaintiff was incorporated. These employees worked for a radiologist that ran a similar type of practice at the same locations. This radiologist also had close associations with Sher and Vayman.

Dr. Carothers openly credited Vayman as being the source of all of plaintiff's referrals. He never spoke with Vayman about how to market the practice nor did he know which doctors she had targeted as a referral base. In January 2005, he believed that the practice had 125 referring physicians but admitted to meeting only one of them. Curiously, while Dr. Carothers had no referral base of his own, in May and June of 2006, more than 2,500 scans were done per month. Plaintiff's counsel proffered the absurd argument that this was due to the location of the facilities.

That Dr. Carothers did not own or control the corporation was further demonstrated by how money flowed into and out of

the corporate bank accounts. Only Vayman wrote checks on behalf of the corporation. On many occasions she transferred money from the corporate account into her personal account without Dr. Carothers' knowledge. On one such occasion, she withdrew $500,000 from the corporate account and transferred it to her personal account. Dr. Carothers did not become aware of this until several months later. Vayman also used corporate checks to pay a multitude of noncorporate expenses, including a payment to the Las Vegas Valley Water District for a home owned by Sher, payments on a Chase auto lease for a Mitsubishi, that Dr. Carothers believed belonged to Sher, and payments to Pureless Pool Services, GMAC, Chase Chemical MasterCard account, Verizon Wireless, AT&T Residential Long Distance, Nissan Motor Acceptance Corp. and an $18,000 transfer to Countrywide Home Loan, all of which were for noncorporate purposes. Although Dr. Carothers believed all of these were appropriate and authorized, he could not explain how any of these transactions related to the plaintiff's business.

Dr. Carothers' lack of true ownership and control over the corporation was further illustrated by his lack of knowledge concerning how money was funneled out of the bank accounts. He was totally unaware that $818,000 had been transferred from the plaintiff's corporate account into Mr. Sher's account and then retransferred to Vayman's personal account. He was also unaware that $1,300,000 had been transferred out of the plaintiff's corporate account to Mr. Sher's account and then retransferred to a company called News International Group, Inc., a company that had been started by Vayman.

In support of defendants' claim that Dr. Carothers was not engaged in the practice of medicine during his association with the plaintiff, defendants demonstrated that out of the approximate 38,000 MRI scans that were read during the time that plaintiff was in business, only 79 were purportedly read by Dr. Carothers. However, a review of even these 79 reports revealed that they all included a signature tag revealing that they were actually read by Dr. Jeffrey Chess, not Dr. Carothers. Dr. Chess did all the readings for the plaintiff out of his home office and was never actually present at the plaintiff's facilities. Dr. Chess earned $800,000 a year as a reading radiologist in contrast to Dr. Carothers who earned only $136,000 a year.

Neither Sher nor Vayman testified at trial. While they each appeared at pretrial depositions, both asserted their Fifth Amendment privilege against self-incrimination and each

refused to answer a single relevant question. Over plaintiff's objection, the court allowed defendants to read the transcripts of Sher's and Vayman's depositions to the jury.

## C. The Charge

The jury was charged that to find that plaintiff was fraudulently incorporated, it had to find that the business relationships between the plaintiff and Sher and Vayman were, in effect, partnerships or arrangements in which Sher and Vayman were so entangled with the affairs of the corporation that reasonable people would say that Sher and/or Vayman were de facto owners of the corporation or exercised substantial control over the corporation. The jury was told that in assessing whether Sher and/or Vayman were de facto owners and whether they exercised substantial control over the plaintiff corporation, they could take into consideration the extent to which Sher and Vayman acted through MRI Global and Forum Medical.

The jury was further told that to find that Sher and/or Vayman were de facto owners of the plaintiff, they had to find that they exhibited the attributes of ownership, particularly, that they exercised dominion and control over the corporation and its assets, that they shared in the risks and the expenses of the corporation and that they had an interest in the profits and losses of the corporation. They were told that any money Vayman received in salary and compensation should not be considered profits if such compensation was negotiated in good faith and at arm's length and was not in actuality a means to channel the profits of the corporation to Vayman. Likewise, they were told that any money received by Sher and/or Ms. Vayman pursuant to the equipment and ground leases were not to be considered profits if the leases were negotiated in good faith and at arm's length and were not simply a means to channel the corporation's profits to Mr. Sher and/or Ms. Vayman.

With respect to the issue of control, the jury was instructed that to find that Sher and/or Vayman exercised substantial control over the plaintiff, it was not enough to find that they had mere business relationships with the corporation. They were told that they had to find that they had a significant role in the guidance, management and direction of the business of the corporation. It was explained that it was not enough to find that they took directions and performed tasks that were necessary and helpful to the corporation or that they merely provided goods and services that benefitted the corporation. They were instructed that the crucial question was not whether Sher and

Vayman were employed by the corporation, but whether and to what extent they exercised control over the course of the corporation's business. The jury was cautioned that there is a substantial difference between one who exercises substantial control over a corporation's business and one who merely has a business relationship with the corporation but does not exercise substantial control over a corporation.

In determining whether or not Sher and/or Vayman owned and/or controlled the plaintiff, the jury was told that they should consider the totality of the circumstances and weigh all relevant factors including a list of nonexclusive factors that was read to them.[1]

---

**1.** These factors included: (1) whether Hillel Sher and his companies' dealings with the professional medical corporation were arm's length, i.e., whether the agreements between Andrew Carothers, M.D., P.C. and Forum Medical/MRI Global were the products of arm's length transactions or whether the financial and nonfinancial terms were designed to give Mr. Sher and his companies substantial control over the corporation and to channel to Mr. Sher the profits of the corporation; (2) whether and the extent to which Hillel Sher and/or Irina Vayman *exercised dominion and control over the assets of Andrew Carothers, M.D., P.C.*, including the corporation's bank accounts; (3) whether and the extent to which Andrew Carothers, M.D., P.C. was capitalized by Dr. Carothers, Mr. Sher and Ms. Vayman, i.e., the extent to which these individuals made capital investments in the corporation; (4) whether and the extent to which the funds of the professional medical corporation were used by Irina Vayman and Hillel Sher for personal rather than corporate purposes; (5) whether and the extent to which Hillel Sher and/or Irina Vayman had the ability to bind the medical professional corporation to legal obligations with third parties; (6) whether and the extent to which Hillel Sher and/or Irina Vayman were responsible for the hiring, firing and/or payment of salaries of the medical professional corporation's employees and whether and the extent to which they dictated policy decisions; (7) whether and the extent to which the day-to-day formalities that are part and parcel of the corporate existence were followed by the professional medical corporation, including the issuance of stock, election of directors, holding of corporate meetings, keeping of contemporaneous corporate books and records and the filing of corporate income tax returns; (8) whether and the extent to which the professional corporation and Hillel Sher's companies had common office space, address and telephone numbers; (9) whether and the extent to which Dr. Carothers played a substantial role in the day-to-day and overall operation and management of the medical professional corporation; (10) whether and the extent to which Hillel Sher and/or Irina Vayman assumed the financial obligations of the medical professional corporation as if they were their own; (11) whether and the extent to which the funds of the professional corporation and those of MRI Global and Forum Medical were commingled; (12) whether and the extent to which Dr. Carothers, Mr. Sher and Ms. Vayman shared the risks, expenses, and interest in the profits and losses of the corporation; and (13) whether and to what extent Hillel Sher and/or Vayman played a role in the professional decisionmaking of the corporation.

With respect to the issue of whether Dr. Carothers was engaged in the practice of medicine through the plaintiff, the jury was charged that Business Corporation Law § 1507[2] prohibits a licensed physician from being a shareholder in a professional medical corporation unless he is engaged in the practice of medicine in that corporation. The jury was further told that the practice of medicine includes diagnosing, by way of MRI scanning, any human disease, pain, injury, deformity or physical condition and that a physician is engaged in the practice of medicine if he, either directly or indirectly, is involved with making professional medical decisions concerning individual patients.

Finally, the jury was told that they were entitled to draw an adverse inference against the plaintiff due to the refusal by Sher and Vayman to testify on Fifth Amendment grounds.

## D. The Verdict

The jury returned a verdict finding that the plaintiff was fraudulently incorporated and that Dr. Carothers was not engaged in the practice of medicine with the plaintiff while plaintiff was in business.

## II.

## Discussion

### A. The Alleged Charge Error on Fraudulent Incorporation

#### 1. Should the Jury Have Been Charged on the Elements of Fraud?

■ Plaintiff contends that the charge on fraudulent incorporation was erroneous for a variety of reasons. First, plaintiff argues that under *Mallela*, in order to prove fraudulent incorporation, defendants were required to prove the traditional elements of a cause of action for common-law fraud,[3] including the elements of scienter and intent to defraud. Plaintiff

---

**2.** Business Corporation Law § 1507 provides:

"A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation or a predecessor entity, or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued."

**3.** To prevail on a cause of action for common-law fraud, plaintiff must plead and prove the following: (1) a false representation; (2) of material fact; (3) with intent to defraud; (4) reasonable reliance on the representation;

maintains that since the charge on fraudulent incorporation did not encompass these elements, it was erroneous as a matter of law. The court disagrees.

The holding in *Mallela* centered on 11 NYCRR 65-3.16 (a) (12), a regulation promulgated by the Superintendent of Insurance which provides that "[a] provider of health care services is not eligible for reimbursement under section 5102 (a) (1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement." The *Mallela* Court rejected defendants' contention that 11 NYCRR 65-3.16 (a) (12) conflicted with the prompt payment goals of the no-fault statutes and held that the Superintendent acted within the scope of his authority in promulgating the regulation and that the "rule has the force of law and represents the policy choice of this State" (*Mallela*, 4 NY3d at 321). The *Mallela* Court proceeded to apply 11 NYCRR 65-3.16 (a) (12) to the facts that were being alleged and held that if the plaintiff insurer's claims were true,[4] the defendant medical corporations would not be eligible for reimbursement under section 5102 (a) (1) of the Insurance Law since they "undisputedly fail to meet the applicable state licensing requirements, which prohibit nonphysicians from owning or controlling medical service corporations" (*Mallela*, 4 NY3d at 320-321).[5]

---

(5) causing damage to the plaintiff (*Lama Holding Co. v Smith Barney*, 88 NY2d 413 [1996]).

    **4.** In its complaint, the plaintiff insurer claimed that

        "the unlicensed defendants paid physicians to use their names on paperwork filed with the State to establish medical service corporations. Once the medical service corporations were established under the facially valid cover of the nominal physician-owners, the nonphysicians actually operated the companies. To maintain the appearance that the physicians owned the entities, the nonphysicians caused the corporations to hire management companies (owned by the nonphysicians), which billed the medical corporations inflated rates for routine services. In this manner, the actual profits did not go to the nominal owners but were channeled to the nonphysicians who owned the management companies" (*Mallela*, 4 NY3d at 319-320).

    **5.** The licensing requirements the Court was referring to are set forth in Business Corporation Law §§ 1507 and 1508. Business Corporation Law § 1507, in relevant part, provides:

        "A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation or a predecessor entity, or who will engage in

While plaintiff does not now question the validity of 11 NYCRR 65-3.16 (a) (12), plaintiff maintains that the *Mallela* Court effectively held that 11 NYCRR 65-3.16 (a) (12) is not properly invoked unless a health care provider commits a wilful and material violation of a state or local licensing requirement that amounts to fraud. As plaintiff points out, the *Mallela* Court stated that 11 NYCRR 65-3.16 (a) (12) only allows carriers to look beyond the face of licensing documents to identify "willful and material failure to abide by state and local law" (*Mallela*, 4 NY3d at 321) and does not permit carriers to delay the payment of claims to pursue investigations into a provider's licensing status unless they can "demonstrate behavior tantamount to fraud" (*Mallela*, 4 NY3d at 322). Further, the Court made clear that "[t]echnical violations will not do" such as "a failure to hold an annual meeting, pay corporate filing fees or submit otherwise acceptable paperwork on time" as such do not "rise to the level of fraud" (*id.*). Hence, plaintiff maintains that establishing a violation of a state or local licensing requirement, without establishing the elements of fraud, will not trigger the application of 11 NYCRR 65-3.16 (a) (12).

Plaintiff's argument is to some degree persuasive and the court agrees that, under *Mallela*, it is likely that not all state and local licensing violations will render a medical corporation ineligible for reimbursement of first-party benefits. However, the pivotal issue of fact in *Mallela* was whether the defendant medical corporations were owned or controlled by nonphysicians. The Court clearly held that if the plaintiff ultimately demonstrated that the defendant medical corporations were owned or controlled by nonphysicians, in violation of Business Corporation Law §§ 1507 and 1508, they would not be eligible for reimbursement pursuant to 11 NYCRR 65-3.16 (a) (12). Nowhere did the Court state or suggest that plaintiff had to demonstrate anything more. Thus, to the extent that *Mallela* stands for the proposition that a carrier has the burden of demonstrating a wilful and material violation of a state or local licensing requirement that amounts to fraud in order to trigger

the practice of such profession in such corporation within thirty days of the date such shares are issued."

Business Corporation Law § 1508 provides:

"No individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession which such corporation is authorized to practice and is either a shareholder of such corporation or engaged in the practice of his profession in such corporation."

11 NYCRR 65-3.16 (a) (12), it also stands for the proposition that a carrier can meet this burden by demonstrating that a medical corporation is owned or controlled by nonphysicians.

Here, the jury was asked whether plaintiff was owned and controlled by Sher and Vayman. The jury answered these questions in the affirmative. Its answers to these questions established that the plaintiff was fraudulently incorporated and that it was not entitled to reimbursement of first-party benefits. It was not necessary to instruct the jury as to the elements of common-law fraud.

### 2. The "Time of Incorporation" Argument

Next, plaintiff claims that defendants were required to show that plaintiff was fraudulently incorporated at the time it was incorporated and that since the charge on fraudulent incorporation did not limit the jury's focus to the time plaintiff was incorporated, the charge was erroneous as a matter of law. Again, the court disagrees.

As stated, the defense of fraudulent incorporation arises out of 11 NYCRR 65-3.16 (a) (12), which renders a health care provider ineligible for reimbursement of first-party benefits if it fails to meet any applicable licensing requirement. "The regulation does not render a provider ineligible only when it fails to meet licensing requirements at the time of its incorporation" (see AIU Ins. Co. v Deajess Med. Imaging, P.C., 24 Misc 3d 161, 168 [Sup Ct, Nassau County 2009]; see also Utica Natl. Ins. Group v Luban, 22 Misc 3d 1107[A], 2008 NY Slip Op 52610[U] [Sup Ct, Queens County 2008, Kitzes, J.]). Neither the Mallela Court nor any other court has read such a restriction into the regulation. Further, there is no language in Business Corporation Law §§ 1507 or 1508 suggesting that a provider only has to meet the licensing requirements set forth therein at the time of incorporation. In accord with AIU Ins. Co. (supra) and Utica Natl. Ins. Group (supra), this court holds that a medical corporation that was fraudulently incorporated at the time services were provided is not eligible for reimbursement of first-party benefits.

### 3. The Other Alleged Charge Error

Plaintiff raises two other arguments in support of its contention that the charge on fraudulent incorporation was erroneous. First, plaintiff maintains that the only question that should have been put to the jury was whether "the corporation's formative agreements and contracts were shams" as its

answer to this question would have determined whether plaintiff was fraudulently incorporated. Second, plaintiff maintains that the charge on fraudulent incorporation erroneously permitted the jury to conclude that active, yet ordinary, employees of a legitimate medical service corporation could be de facto owners, directors, and shareholders of the corporation.

The court rejects both arguments. In the court's view, the jury was properly instructed that in determining whether plaintiff was fraudulently incorporated, it could consider the totality of the circumstances and all relevant factors. Whether or not the corporation's formative agreements and contracts were shams, although highly relevant, should not have been the determinative issue. Further, the court believes that its instructions as to what constitutes de facto ownership and control were proper.

### B. Dr. Carothers' Practice of Medicine Through the Corporation

The court is not persuaded that it erred in including on the verdict form the question of whether Dr. Carothers actually practiced medicine through the plaintiff. In *Mallela,* the Court acknowledged that a medical corporation that operates in material noncompliance with Business Corporation Law § 1507 is not entitled to recover first-party benefits. Business Corporation Law § 1507 not only requires professional service corporations to "issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice," the statute also requires that all shareholders be "engaged in the practice of such profession in such corporation . . . or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued." The court sees no reasons why a violation of this latter portion of Business Corporation Law § 1507 should be treated differently than a violation of that portion of Business Corporation Law § 1507 which prohibits nonphysician ownership of medical corporations. The court rejects plaintiff's contention that the charge as to what constitutes the practice of medicine was erroneous.

### C. The Fifth Amendment Issue

■ Plaintiff's contention that the court erred in allowing defendants to read the depositions of Sher and Vayman is without merit.

> "[T]he deposition of any person may be used by any party for any purpose against any other party who was present or represented at the taking of the dep-

osition . . . provided the court finds: . . .

"(ii) that the witness is at a greater distance than one hundred miles from the place of trial or is out of the state" (CPLR 3117 [a] [3] [ii]).

Here, plaintiff's counsel was present at the two depositions and questioned both of the witnesses. Further, plaintiff's counsel stipulated at trial that both witnesses were unavailable pursuant to CPLR 3117 (a) (3).

While it is true that both Sher and Vayman asserted their Fifth Amendment privilege against self-incrimination and refused to give any substantive testimony, plaintiff's counsel's contention that allowing the transcripts to be read to the jury only served to prejudice the jury against the plaintiff is without merit. Their refusal to testify itself was highly relevant as such served as the predicate for the adverse inference charge that the jury was given following the close of evidence.

Plaintiff's contention that the adverse witness charge was contrary to New York law is likewise without merit. It is now well accepted that when a party to a civil action asserts his or her Fifth Amendment privilege against self-incrimination and refuses to testify, the factfinder may draw an adverse inference against that party (*see Marine Midland Bank v Russo Produce Co.*, 50 NY2d 31, 42-43 [1980]; *Matter of Boter*, 46 AD3d 1, 7 [1st Dept 2007]; *Matter of Muraskin*, 286 AD2d 186, 187 [1st Dept 2001]). While it is true that an adverse inference may not generally be drawn against a party when a nonparty asserts the privilege (*see Access Capital v DeCicco*, 302 AD2d 48, 52 [1st Dept 2002]; *State of New York v Markowitz*, 273 AD2d 637, 646 [3d Dept 2000], *lv denied* 95 NY2d 770 [2000]), the courts in this state have recognized several exceptions to this rule, two of which apply in this case.

One of these exceptions deals with the situation where a corporate employee, who is the alter ego of his or her corporate employer, refuses to testify on Fifth Amendment grounds. Relying on the seminal case of *Niesig v Team I* ('76 NY2d 363 [1990]), the Court in *State v Markowitz* (*supra*) recognized that under these circumstances, the corporate employee should be deemed a party and that it would be appropriate for the factfinder to draw an adverse inference against the corporation due to the employee's refusal to testify (*State of New York v Markowitz*, 273 AD2d at 646).

The second of these exceptions deals with the situation when the nonparty who asserts his or her Fifth Amendment privilege

and refuses to testify is a material witness in a particular party's control. In *Califano v City of New York* (212 AD2d 146 [1st Dept 1995]), the Court held that "[t]he inference to be charged in a civil case by a [nonparty] witness's invocation of the privilege against self-incrimination is 'akin to that arising when a party fails or refuses to produce a material witness who is within his control'" (*Califano*, 212 AD2d at 154, quoting *Marine Midland Bank*, 50 NY2d at 42, citing Prince, Richardson on Evidence § 534 [10th ed]). "Such nonproduction may be considered by a jury in assessing the strength of evidence offered by the opposite party on the issue which the witness was in a position to controvert" (*id.* [internal quotation marks omitted]).

Thus, under New York law, the propriety of the adverse inference charge turned largely on whether it could be said that Sher and Vayman were alter egos of the plaintiff within the meaning of *State of New York v Markowitz* and *Niesig v Team I* and whether they were material witnesses in plaintiff's control. These were preliminary questions of fact for the court to decide, particularly since they involved issues of credibility (*see People v Raja*, 77 AD2d 322, 327 [2d Dept 1980]; *People v Dillenbeck*, 115 AD2d 331, 332 [4th Dept 1985]; *People v Blackman*, 110 AD2d 596, 598 [1st Dept 1985]) and were properly decided in defendants' favor.

Overwhelming evidence was developed both pretrial and during trial that while plaintiff was in business, Sher and Vayman were its actual owners and the ones who controlled its operations. No credible evidence was presented demonstrating that their relationships with plaintiff were different at the time of their depositions or at the time of trial. While Dr. Carothers testified at trial that he was the sole owner, officer and director of the corporation, and that Vayman was nothing more than an employee whose employment relationship had ceased prior to her deposition, the court was not required to accept Dr. Carothers' testimony as true.

> "When passing upon preliminary questions of fact in determining the admissibility of evidence, a trial court is not bound to accept the uncontradicted testimony of a witness. A trial court observes a witness, hears his testimony and therefore is in a special position to evaluate and integrate that evidence with other facts before it" (*People v Caprio*, 25 AD2d 145, 151 [2d Dept 1966], *affd* 18 NY2d 617 [1966]).

Finally, in deciding whether or not it was appropriate to give the adverse inference charge, the court was guided, in part, by the seminal case of *LiButti v United States* (107 F3d 110 [2d Cir 1997]), which is widely accepted in the federal courts.[6] While *LiButti* has not been officially adopted by any New York State court, the decision is well reasoned, consistent with New York law and provides an excellent analytical framework for deciding whether an adverse inference charge should be given where an alleged nonparty invokes his or her Fifth Amendment privilege.

In *LiButti*, the court held that in determining the admissibility of a nonparty's invocation of the Fifth Amendment privilege against self-incrimination and whether the factfinder should be permitted to draw an adverse inference as a result thereof, the trial court should consider four nonexclusive factors: (1) the nature of the relevant relationships;[7] (2) the degree of control of the party over the nonparty witness;[8] (3) the compatibility of the interests of the party and nonparty witness in the outcome of the litigation;[9] and (4) the role of the nonparty witness in the

---

**6.** *See e.g. United States v Zerjav*, 2009 WL 912821, *33, 2009 US Dist Lexis 27683, *96-97 (ED Mo 2009); *Limone v United States*, 497 F Supp 2d 143, 176 (D Mass 2007); *Bernal v All Am. Inv. Realty, Inc.*, 479 F Supp 2d 1291, 1337 (SD Fla 2007); *United States Sec. & Exch. Commn. v Universal Express, Inc.*, 475 F Supp 2d 412, 439 (SD NY 2007); *Emerson v Wembley USA Inc.*, 433 F Supp 2d 1200, 1212 (D Colo 2006); *Nike Inc. v Variety Wholesalers, Inc.*, 274 F Supp 2d 1352, 1355 (SD Ga 2003); *Kontos v Kontos*, 968 F Supp 400, 406 (SD Ind 1997).

**7.** "While no particular relationship governs, the nature of the relationship will invariably be the most significant circumstance. It should be examined, however, from the perspective of a nonparty witness' loyalty to the plaintiff or defendant, as the case may be. The closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship" (*LiButti*, 107 F3d at 123).

**8.** "The degree of control which the party has vested in the nonparty witness in regard to the key facts and general subject matter of the litigation will likely inform the trial court whether the assertion of the privilege should be viewed as akin to testimony approaching admissibility under Fed.R.Evid. 801 (d) (2), and may accordingly be viewed, as in *Brink's*, as a vicarious admission" (*LiButti*, 107 F3d at 123).

**9.** "The trial court should evaluate whether the non-party witness is pragmatically a noncaptioned party in interest and whether the assertion of the privilege advances the interests of both the non-party witness and the affected party in the outcome of the litigation" (*LiButti*, 107 F3d at 123).

litigation[10] (107 F3d at 124). "Whether these or other circumstances unique to a particular case are considered by the trial court, the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth" (107 F3d at 124).

When these and all the other relevant circumstances were considered, it was clear to the court that an adverse inference would be trustworthy and advance the search for the truth.[11]

## D. The Other Alleged Erroneous Evidentiary Rulings

The court has considered the plaintiff's remaining arguments, including those concerning the other alleged erroneous evidentiary rulings, and finds them to be without merit.

## III. Conclusion

For all of the above reasons, it is hereby ordered that plaintiff's motion is denied in its entirety. All stays are lifted and defendants may enter judgments against the plaintiff dismissing each of the actions that were joined for trial and those actions that are the subject matter of the stipulations between the parties and the prior orders of the court.

---

**10.** "Whether the non-party witness was a key figure in the litigation and played a controlling role in respect to any of its underlying aspects also logically merits consideration by the trial court" (*LiButti*, 107 F3d at 123-124).

**11.** Defendants aptly illustrate in their opposition papers the parallels between *LiButti* and this case and how consideration of the *LiButti* factors and other circumstances of this case warranted the adverse inference charge.