OPINION OF THE COURT
Memorandum.
Ordered that the judgment is affirmed, without costs.
Plaintiff Andrew Carothers, M.D., EC. (ACMDPC) is a professional corporation which performed MRIs for patients allegedly injured in motor vehicle accidents. ACMDPC operated out of three facilities — one in Brooklyn, one in Queens and one in the Bronx. At the time the MRI services in question were rendered, Dr. Andrew Carothers was a board-certified, licensed radiologist, who had been listed on ACMDPC’s corporate filings as its sole shareholder, officer and director.
ACMDPC’s patients assigned to ACMDPC their right to reimbursement of first-party no-fault benefits. ACMDPC submitted the assigned claims for reimbursement to the various responsible insurers and self-insurers, including defendant Progressive Insurance Company (Progressive). After the insurers and self-insurers failed to pay the claims in question, ACMDPC commenced thousands of actions against them.
*34 A joint trial was held of actions pending in Richmond County and Kings County between ACMDPC and 53 insurers and self-insurers, including the instant action. The total amount sought for the claims in all of these actions was approximately $18 million. The defense asserted was that ACMDPC was not entitled to reimbursement of the claims because of ACMDPC’s failure to comply with Insurance Department Regulations (11 NYCRR) § 65-3.16 (a) (12), which renders a provider ineligible to recover no-fault benefits under Insurance Law § 5102 (a) (1) if the provider fails to meet “any applicable” state or local licensing requirement necessary to perform its services in New York. On July 17, 2008, after a joint trial, the jury returned a verdict in favor of all 53 defendants. By order entered October 14, 2009 (26 Mise 3d 448 [2009]), the Civil Court (Peter Paul Sweeney, J.) denied plaintiff’s motion, pursuant to CPLR 4404 (a), to set aside the jury verdict. Thereafter, it was agreed, by so-ordered stipulation, that, with the exception of the instant action, judgments would not be entered pending the disposition of this appeal. A judgment in this action, dismissing the complaint, was entered on December 7, 2010, from which this appeal is taken.
We note at the outset that there is no merit to plaintiff’s contention that the Civil Court, as a court of limited monetary jurisdiction (see CCA 202), lacked jurisdiction to adjudicate this case because the aggregate amount in controversy was approximately $18 million. This was a joint trial where the Civil Court had before it separate causes of action, each of which was within the monetary jurisdiction of the Civil Court (see generally Board of Mgrs. of Mews at N. Hills Condominium v Farajzadeh, 189 Misc 2d 38 [App Term, 2d Dept, 9th & 10th Jud Dists 2001]).
Plaintiff argues that the defense that plaintiff was ineligible to recover no-fault benefits was barred by the doctrine of res judicata because some of the defendants, including Progressive, had been involved in litigation with plaintiff in prior actions in which plaintiff had prevailed, and had failed to raise or litigate that defense in those prior actions. Responding to the same argument, the Civil Court (Peter Paul Sweeney, J.), in its April 27, 2009 order denying plaintiff’s motion for summary judgment (23 Misc 3d 1118[A], 2009 NY Slip Op 50831[U], *4 [2009]), stated that the fact that the ineligibility defense could have been litigated in the prior actions was not determinative, as “the inquiry must always be as to the point or question actually litigated and determined in the original action, not what *35 might have been thus litigated and determined” (quoting Cromwell v County of Sac, 94 US 351, 353 [1877]). The Civil Court noted that the claims for first-party no-fault benefits at issue in this joint trial differed from the claims for first-party no-fault benefits that had been litigated in the prior actions, and that plaintiff had presented the court with no proof that the ineligibility defense had been “actually and necessarily” determined in any of the prior actions (Smith v Kirkpatrick, 305 NY 66, 70 [1953]). In our view, the Civil Court’s determination was proper.
“While a valid final judgment bars future actions between the same parties on the same cause of action, a subsequent action will not be barred by res judicata where the nature or object of the second action is distinct from that in a prior action in which a judgment was rendered.
“Where a second action is upon a different claim, demand, or cause of action, the established rule is that the judgment in the first action operates as an estoppel only as to the points or questions actually litigated and determined. Thus, where the two causes of action are different, not in form only but also in the rights and interests affected, the estoppel is limited to the point actually determined” (9 Carmody-Wait 2d § 63:474).
As noted, the essence of the defense in this case was plaintiffs ineligibility to recover no-fault benefits due to plaintiffs failure to comply with New York State’s licensing requirements, based firstly on ACMDPC’s alleged failure, as a professional corporation, to be owned and controlled only by licensed professionals engaged in the practice of such profession in such corporations (see Business Corporation Law §§ 1503 [a]; 1507, 1508). The theory underlying this defense was that Dr. Carothers was not the true owner, or at least not the sole owner, and operator of ACMDPC, which allegedly was actually owned or co-owned and controlled by nonparties Hillel Sher and Irina Vayman, two individuals who were not physicians, but who had received the bulk of ACMDPC’s profits. Thus, in order to find that plaintiff was not entitled to reimbursement, the jury had to find that plaintiff was actually owned, co-owned or controlled by unlicensed individuals (see e.g. One Beacon Ins. Group, LLC v Midland Med. Care, P.C., 54 AD3d 738 [2008]). A second theory of the defense was that Dr. Carothers had violated Business Corporation Law § 1507 because, as sole shareholder, he had not been personally “engaged in the practice” of medicine in ACMDPC during the time ACMDPC had been in business.
*36 Prior to the commencement of the trial, Sher, who had leased the premises in which the MRI facilities were located, and the equipment therein, to Dr. Carothers, and Vayman, who had served as ACMDPC’s office manager, had been deposed. Both had invoked their Fifth Amendment privilege in response to virtually all the questions posed of them during their respective depositions. Although the parties agreed that neither Sher nor Vayman was available to testify at the trial, within the meaning of CPLR 3117 (a) (3), plaintiffs counsel asked the Civil Court to direct the defense not to read the deposition transcripts to the jury, claiming that the deposition testimony was of no probative value and only served to prejudice plaintiff. The Civil Court, finding that the testimony was relevant to the issues at trial, permitted the defense to read the deposition transcripts to the jury, and ultimately charged the jury that an adverse inference could be drawn against plaintiff based upon Sher’s and Vayman’s invocation of their Fifth Amendment privilege.
The Civil Court had also granted the defense’s motion in limine to preclude plaintiff from referring to the approximately $18 million in accounts receivable which, plaintiff contended, it might have generated had the claims at issue in the various pending actions been paid.
At trial, the defense contended that even though Dr. Carothers was ACMDPC’s nominal owner, and was listed as its only shareholder, officer and director, it was actually Sher and Vayman who were the de facto owners of ACMDPC. Among the primary defense witnesses were a seller of used MRI and CT scan equipment, who testified about the valuation and market for MRI equipment, and whose testimony indicated that the MRI equipment at the ACMDPC facilities was outdated and that ACMDPC’s monthly payments for that equipment were significantly above market value; a board-certified neuroradiologist, who testified about the poor radiological quality of the MRI scans, many of which could not be read, as indicative of Dr. Carothers’ lack of quality control, direction and supervision of ACMDPC; and a forensic accountant and certified valuation analyst, who analyzed the flow of money into and out of ACMDPC, most of which ultimately went into accounts controlled by Sher or Vayman. Defendant also called as a witness Dr. Carothers, who was questioned about, among other things, his relationship with Sher and Vayman, as well as about his actual practice of medicine within ACMDPC.
Plaintiff claimed that, at all relevant times, Sher and Vayman had merely assisted ACMDPC: Sher in his role as the lessor of *37 the premises in which the MRI facilities were located and of the equipment therein, and Vayman as ACMDPC’s office manager. Among plaintiff’s witnesses at trial were Wayne Hickey, a licensed accountant and the chief financial officer of Medtrx, a company which served both as plaintiffs billing agent and as plaintiffs lender, who testified about Medtrx’s billing and collection practices vis-a-vis ACMDPC, as well as its role as a secured lender of ACMDPC; an attorney specializing in structuring and incorporating medical practices, who testified about custom and usage in MRI practices; and an expert in the business valuation aspects of MRI practices. (A more in-depth summary of the trial may be found in the Civil Court’s order denying plaintiffs motion to set aside the jury verdict [26 Misc 3d 448].)
The Civil Court instructed the jury that, in order to find that ACMDPC was “fraudulently incorporated,” it had to find that the business relationships of Sher and Vayman were, in effect, partnerships or arrangements in which Sher and Vayman were so entangled with the affairs of ACMDPC that reasonable people would say that they were the de facto owners of ACMDPC or that they exercised substantial dominion and control over ACMDPC and its assets, and that they shared risks, expenses and interest in ACMDPC’s profits and losses. The jury was instructed that it could look beyond the certificate of incorporation but that, in order to find that Sher and Vayman had exercised substantial control over ACMDPC, it must find that they had a significant role in the guidance, management and direction of the business of ACMDPC. The jury was told to look at the totality of the circumstances, and the court enumerated 13 different factors which the jury might consider relevant in order to determine whether Sher and Vayman were de facto owners of ACMDPC or whether they had exercised substantial control over ACMDPC. Those factors were: (1) whether the agreements between ACMDPC and the entities owned by Sher, which leased the facilities and the equipment to ACMDPC, were the product of arm’s-length transactions or whether the terms of those agreements were designed to give Sher and those entities substantial control over ACMDPC and to channel its profits to Sher; (2) whether and to what extent Sher and Vayman had exercised dominion and control over ACMDPC’s assets, including its bank accounts; (3) whether and to what extent Dr. Carothers, Sher and Vayman had made capital investments in ACMDPC; (4) whether and to what extent Sher and Vayman *38 had used ACMDPC funds for personal rather than for corporate purposes; (5) whether and to what extent Sher and Vayman had the ability to bind ACMDPC to legal obligations with third parties; (6) whether and to what extent Sher and Vayman had been responsible for hiring, firing and/or payment of ACMDPC salaries, and the extent to which they had dictated policy decisions; (7) whether and to what extent the day-to-day formalities that are part and parcel of the corporate existence (including the issuance of stock, election of directors, holding of corporate meetings, keeping of books and records and filing of corporate tax returns) had been followed; (8) whether and to what extent ACMDPC and Sher’s companies shared common office space, addresses, employees and telephone numbers; (9) whether and to what extent Dr. Carothers had played a substantial role in the day-to-day operation of ACMDPC; (10) whether and to what extent Sher and/or Vayman had assumed the financial obligations of ACMDPC as if they were their own; (11) whether and to what extent ACMDPC funds had been commingled with those of the other entities owned by Sher; (12) whether and to what extent Dr. Carothers, Sher and Vayman had shared the risks, expenses and interest in the profits and losses of the corporation; and (13) whether and to what extent Sher and Vayman had been involved in making professional medical decisions regarding the practice of ACMDPC.
The Civil Court then asked the jury to decide whether Dr. Carothers was engaged in the practice of medicine in ACMDPC, within the meaning of Business Corporation Law § 1507, during the time ACMDPC was in business. It instructed the jury that the practice of medicine included “diagnosis by way of MRI scans” and that a physician is engaged in the practice of medicine “if he either directly or indirectly is involved with the making of professional medical decisions concerning individual clients or patients.”
Regarding Sher’s and Vayman’s invocation of their Fifth Amendment privilege at their depositions, the Civil Court told the jury that it could, but was not required to, infer, by their refusal to answer questions regarding de facto ownership and control over ACMDPC, that their answers would have been adverse to ACMDPC’s interest. The jury could not, however, rely on such an adverse inference, should it choose to draw one, as the only basis for concluding that ACMDPC was not solely owned or controlled by Dr. Carothers.
The jury found that the defense had proved by clear and convincing evidence both that ACMDPC was “fraudulently *39 incorporated” and that Dr. Carothers had not engaged in the practice of medicine in ACMDPC during the time ACMDPC was in business. Plaintiff thereafter moved, pursuant to CPLR 4404 (a), to set aside the verdict and to enter judgment in its favor, or to grant a new trial, contending that the Civil Court had: (1) improperly instructed the jury on “fraudulent incorporation”; (2) erroneously instructed the jury on the “practice of medicine”; (3) erroneously permitted the jury to consider and draw an adverse inference against plaintiff based upon Sher’s and Vayman’s invocation of their Fifth Amendment privilege; and (4) made numerous erroneous evidentiary rulings throughout the course of the trial. The motion was denied by the Civil Court in an October 14, 2009 order (26 Misc 3d 448), and a judgment dismissing the complaint was subsequently entered.
On appeal, plaintiff asks this court to reverse the judgment, to set aside the jury verdict, and either to enter judgment in its favor or to grant a new trial, claiming, with respect to the “fraudulent incorporation” defense, that the Civil Court’s erroneous and prejudicial orders and various trial rulings deprived it of a full and fair opportunity to refute that defense. Among the trial rulings highlighted by plaintiff are those involving the Civil Court’s decision to permit the reading of the depositions of nonparties Sher and Vayman, in which they, respectively, had invoked their Fifth Amendment privilege, coupled with the court’s later decision to instruct the jury that it could draw a negative inference against plaintiff based upon Sher’s and Vayman’s invocation of their Fifth Amendment privilege. Plaintiff also argues that the Civil Court’s decision to preclude evidence of ACMDPC’s financial profile, in particular the approximately $18 million in accounts receivable that was allegedly owed to ACMDPC by the insurance companies, prejudiced plaintiff’s ability to respond to the “fraudulent incorporation” defense. The most egregious errors warranting reversal, contends plaintiff, were in the Civil Court’s instructions to the jury regarding the “fraudulent incorporation” defense, particularly because the Civil Court, among other things: (1) failed to recognize that such defense requires a finding of fraud and fraudulent intent at the time of incorporation and did not instruct the jury thereon; and (2) developed a novel 13-factor test to be applied in this situation, which test was inappropriate and misleading, instead of providing instructions on common-law fraud, sham transactions, and the business-judgment rule. Plaintiff further contends that it was error for the Civil Court to instruct the jury regarding the “practice of medicine.”
*40 The question of whether an “unlawfully incorporated” professional corporation was eligible for no-fault reimbursement was certified to New York’s Court of Appeals by the United States Court of Appeals for the Second Circuit in State Farm Mut. Auto. Ins. Co. v Mallela (372 F3d 500, 501 [2d Cir 2004]), where the Second Circuit noted that New York law forbade nonphysicians from employing physicians or controlling their practices because of New York’s long-standing concern that the “corporate practice of medicine” would create ethical conflicts and undermine the quality of care afforded to patients (372 F3d at 503). In response to the certified question, New York’s Court of Appeals concluded that insurers were entitled to withhold payment of no-fault benefits for medical services provided by “fraudulently incorporated” enterprises to which patients had assigned their claims (4 NY3d 313 [2005]). The Court noted that the complaint therein centered on fraud “in the corporate form rather than on the quality of care provided” {id. at 320), and specifically rejected the providers’ argument that the patients had received appropriate care from licensed professionals, which care was within the scope of the licenses of those who had treated the patients. “The fact remains that the reimbursement goes to the medical service corporation that exists to receive payment only because of its willfully and materially false filings with state regulators” {id. at 321). The Court also indicated that a professional corporation’s mere failure to observe corporate formalities, such as failing to hold an annual meeting, or failing to pay corporate filing fees or to timely submit paperwork, would not render a provider ineligible, but that carriers could “look beyond the face of licensing documents to identify willful and material failure to abide by state and local law,” and that such conduct, “tantamount to fraud,” would render the provider ineligible for no-fault reimbursement {id. at 321, 322).
We disagree with plaintiffs contention that the Civil Court erroneously instructed the jury on the essential aspects of the Mallela defense by failing to instruct the jury regarding the elements of fraud and by failing to instruct the jury that defendant must have established that there was a fraudulent intent at the time of the provider’s incorporation. Although both the United States Court of Appeals for the Second Circuit and New York’s Court of Appeals employed the term “fraudulently incorporated” in the Mallela case, which was the term used in the certified question, the essence of the defense in that case, as here, *41 was the provider’s “lack of eligibility,” which does not require a finding of fraud or fraudulent intent, but rather, addresses the actual operation and control of a medical professional corporation by unlicensed individuals.
As noted above, a reading of the Mallela case demonstrates that the case involved fraud “in the corporate form” (id. at 320) rather than the more traditional forms of common-law fraud. In fact, the New York Court of Appeals, in Mallela, noted that the Superintendent of Insurance, in an amicus curiae brief, had asserted that Insurance Department Regulations (11 NYCRR) § 65-3.16 (a) (12) had been promulgated in order to combat no-fault fraud which was correlative with the corporate practice of medicine by nonphysicians, and suggested that carriers look beyond the licensing documents in order to identify a provider’s “willful and material failure to abide by state and local law” (4 NY3d at 321), thereby triggering issues of eligibility and coverage.
With respect to plaintiffs contention that the issue of “fraudulent incorporation” must be determined by reference to the time that the certificate of incorporation was filed, we initially note that Insurance Department Regulations (11 NYCRR) § 65-3.16 (a) (12) does not, by its terms, limit a provider’s ineligibility to those instances where it fails to meet a licensing requirement at the time of incorporation. Moreover, the Court of Appeals, in Mallela, in analyzing the alleged facts, specifically addressed the allegations made therein regarding the post-incorporation operation of the practice — i.e., the operation of the practice by nonphysicians; the hiring of management companies owned by the nonphysicians which billed the practice at inflated rates; and the channeling of the actual profits of the practice to the management companies — and stated that, if a professional corporation was “fraudulently licensed,” it would not be entitled to reimbursement for no-fault benefits (4 NY3d at 321, 322). The Mallela decision thereby clearly indicated that a professional corporation would be ineligible for no-fault reimbursement if it was in violation of licensing requirements regardless of whether the nominal physician-owner had intended to yield control to unlicensed parties at the time the professional corporation had been formed or had done so at some later time. Finally, the Appellate Division, Second Department, in One Beacon Ins. Group, LLC (54 AD3d 738), after discussing the Mallela case, found that the insurers therein had submitted sufficient evidentiary proof to raise an issue of fact as *42 to whether the provider “was actually controlled by a management company owned by unlicensed individuals in violation of the Business Corporation Law” {id. at 740). In short, the inquiry does not end once the certificate of incorporation is filed.
Although plaintiff contends that the list of 13 factors was so overbroad as to be present in virtually every well-managed medical practice, in our opinion, it was not error for the Civil Court to set forth the list of factors to assist the jury in determining the issue of Sher’s and Vayman’s control over ACMDPC, particularly since the court specifically told the jury that it should consider “the totality of the circumstances” (26 Misc 3d at 455). Contrary to plaintiffs argument, it cannot be said that any single factor weighed more than any other in the jury’s factual determination as to Sher’s and Vayman’s ownership, co-ownership or control of ACMDPC. Moreover, the fact that, of the several enumerated factors, a particular factor may have been considered a “technical violation” (see Mallela, 4 NY3d at 322) and should therefore not have been considered does not require a reversal. The jury was instructed to consider the evidence as a whole, before it even heard the factors, and, presumably, it did so. Furthermore, it is not inappropriate to ask a jury to consider and weigh a number of factors in making its determination of “control” {see e.g. PJI 2:238, PJI 2:255 [which, in the context of vicarious liability, ask the jury to consider various factors in order to determine an entity’s “direction and control”]). Nor, as plaintiff contends, was it necessary for the Civil Court to define terms such as “dominion and control,” “substantial control,” or “arm’s length,” as such terms are common enough to be accorded their everyday meanings. Finally, plaintiff’s proposed charges on “sham transactions” and “the business-judgment rule” were irrelevant and inappropriate, and it was not error for the Civil Court to decline to instruct the jury with respect thereto.
As noted above, there were two theories on which the defense that ACMDPC was not entitled to reimbursement was predicated: the “fraudulent incorporation” defense, i.e., that Dr. Carothers was not the true owner of ACMDPC; and the “practice of medicine” defense, i.e., that Dr. Carothers was not personally engaged in the practice of medicine at ACMDPC.
With regard to the second basis on which the jury found that defendant had proved its defense that ACMDPC was ineligible to recover assigned first-party no-fault benefits, to wit, that Dr. Carothers, as sole shareholder of ACMDPC, had not engaged in *43 the practice of medicine in ACMDPC during the time ACMDPC had been in business (see Business Corporation Law § 1507), plaintiff argues that it was error for the Civil Court to instruct the jury on the “practice of medicine” because that aspect of a plaintiffs eligibility to recover no-fault benefits was not covered by the Mallela case. Plaintiff further argues that, even if Mallela supported such an instruction, the Civil Court improperly restricted the definition of the term “practice” to instances where the physician-owner personally and actively treats patients through the professional corporation. Plaintiff contends that the portion of the jury’s verdict which found that Dr. Carothers was not engaged in the practice of medicine must be set aside as against the weight of the evidence since the evidence showed that Dr. Carothers was actively engaged in the practice of medicine in ACMDPC.
It is true that the “practice of medicine” requirement of Business Corporation Law § 1507 was not addressed in Mallela, as it was not an issue in that case. Nevertheless, a reading of the statute establishes that the failure of a shareholder physician to actually be engaged in the practice of medicine within the professional corporation renders such professional corporation ineligible to recover assigned first-party no-fault benefits. As noted above, under Business Corporation Law § 1507, it is unlawful for a physician to be a shareholder in a professional corporation authorized to practice medicine unless he or she is engaged in the practice of medicine in that professional corporation. Education Law § 6521 defines the practice of the profession of medicine as “diagnosing, treating, operating or prescribing for any human disease, pain, injury, deformity or physical condition.” The Civil Court’s instruction that the practice of medicine included “diagnosis by way of MRI scans,” was proper and, when read as a whole, the charge adequately conveyed the correct legal principles to the jury (see Casella v City of New York, 69 AD3d 549, 550 [2010]; Manna v Don Diego, 261 AD2d 590, 591 [1999]).
Nevertheless, we agree with plaintiffs argument that this portion of the jury verdict should be set aside as contrary to the weight of the evidence. A jury verdict should not be set aside as contrary to the weight of the evidence unless the jury could not have reached the verdict by any fair interpretation of the evidence (see Lolik v Big V Supermarkets, 86 NY2d 744, 746 [1995]; Nicastro v Park, 113 AD2d 129 [1985]). Whether a jury verdict should be set aside as contrary to the weight of the evidence *44 does not involve a question of law, but rather requires a discretionary balancing of many factors (see Cohen v Hallmark Cards, 45 NY2d 493, 498-499 [1978]; Nicastro v Park, 113 AD2d at 134-135). Upon our review of the record, we conclude that this portion of the jury verdict should be set aside since it is not based upon a fair interpretation of the evidence.
Notwithstanding the foregoing, we conclude that the jury’s determination that ACMDPC was ineligible to receive reimbursement based upon the first theory of the defense, i.e., the “fraudulent incorporation” or Mallela defense, is amply supported by the record, and it is on this basis that we affirm the judgment.
Plaintiff contends that it was error to permit Sher’s and Vayman’s deposition testimony, in which both had invoked their Fifth Amendment privilege, to be read to the jury, because the probative value of reading the depositions was outweighed by its prejudicial effect. Plaintiff argues that such error was further compounded by the Civil Court’s instruction to the jury that it could draw an adverse inference against plaintiff based upon their invocation of said privilege.
We agree with the dissent that it was error for the Civil Court to permit the defense to read to the jury the deposition transcripts of nonparties Sher and Vayman, especially where each of the more than 100 questions asked yielded a response invoking the Fifth Amendment. The error was compounded by the repeated references to the nonparties’ depositions in the defense summation to the jury, and in the decision of the court to charge an adverse inference. While it is proper for the court to give such an instruction to the jury in a civil action when a party invokes his or her Fifth Amendment privilege (see Marine Midland Bank v Russo Produce Co., 50 NY2d 31 [1980]), generally, the adverse inference is inappropriate when it is based on a nonparty’s decision to remain silent (see Access Capital v DeCicco, 302 AD2d 48, 52 [2002]; State of New York v Markowitz, 273 AD2d 637 [2000]). However, exceptions have been recognized where the nonparty witness is the alter ego of the defendant (see Searle v Cayuga Med. Ctr. at Ithaca, 28 AD3d 834 [2006]) or where other unique circumstances exist involving the conduct of a nonparty (see LiButti v United States, 107 F3d 110 [2d Cir 1997]). In recognizing the Civil Court’s errors, we are cognizant that any trial record will reveal blemishes, for rarely are trials error free (see United States v Birnbaum, 373 F2d 250 [2d Cir 1967]; People v Kingston, 8 NY2d 384 [1960]). *45 As such, an appellate court is charged with assessing the prejudicial effect of an error to determine if the verdict should be reversed.
The improper admission of evidence by a trial court will be considered harmless as long as there is no indication that the evidence had a “substantial influence upon the result of the trial” (Walker v State of New York, 111 AD2d 164, 165 [1985]; see CPLR 2002; see also Ewanciw v Atlas, 65 AD3d 1077 [2009]; Rizzuto v Getty Petroleum Corp., 289 AD2d 217 [2001]; Barracato v Camp Bauman Buses, 217 AD2d 677 [1995]; Catalan v Empire Stor. Warehouse, 213 AD2d 366 [1995]). Similarly, harmless error analysis will apply where evidence has been improperly excluded (see Geary v Church of St. Thomas Aquinas, 98 AD3d 646 [2012]; Duke v Town of Riverhead, 77 AD3d 702 [2010]; Parlante v Cavallero, 73 AD3d 1001 [2010]; Division Seven, Inc. v HP Bldrs. Corp., 58 AD3d 796 [2009]). The question then is whether, in applying the foregoing principle to the facts of this case, the Civil Court’s error in admitting into evidence the deposition testimony of Sher and Vayman, coupled with the subsequent errors flowing therefrom — i.e., the references to such testimony in the defense summation and the Civil Court’s instruction to the jury regarding drawing an adverse inference against plaintiff — so prejudiced plaintiff as to warrant a new trial, or whether the outcome of this case would have been the same notwithstanding such errors. In making our determination, we must assess the effect of the errors in relationship to all the evidence offered at trial, in order to decide the extent to which the erroneously admitted evidence, and the errors which directly and indirectly resulted from its admission, may have contributed to the jury’s verdict. Among the factors we may consider is the strength of the properly admitted evidence presented by the defense against plaintiff to prove its defense that Dr. Carothers was not plaintiffs true owner (see e.g. Sakin v Fryman, 147 AD2d 626, 627 [1989] [improper questioning of defendant’s expert was not so prejudicial as to have denied defendant a fair trial where “(t)he nature of the evidence of the defendant’s liability was extremely convincing”]).
Considering the ample evidence of Sher’s and Vayman’s control over the hiring of office employees, management of the offices, administration of the billing, demonstrated manipulation of the financial accounts of ACMDPC, and excessive charges for various rentals, including the medical imaging machines, the jury had more than enough evidence to conclude that *46 plaintiff was in violation of the requirement of Business Corporation Law § 1507 that it be owned and controlled solely by licensed professionals. Accordingly, any error committed by the Civil Court may be considered harmless.
Turning to plaintiffs argument that the exclusion of evidence of ACMDPC’s approximately $18 million in accounts receivable for unpaid no-fault claims prevented plaintiff from responding to the defense, we find such contention to lack merit. As the Civil Court noted, plaintiffs inability to determine the outcome of litigation involving thousands of these pending claims rendered the value of its accounts receivable too speculative and uncertain. Indeed, it would have been too unwieldy to have permitted trials within this trial as to the potential viability of all of the pending claims against the various insurance companies. In any event, the jury was aware that there were pending claims with a value of approximately $18 million, as both Dr. Carothers and Mr. Hickey testified to that effect.
In view of the foregoing, as defendant demonstrated that ACMDPC had failed to comply with New York State’s licensing requirement that professional corporations be owned and controlled solely by licensed professionals, we conclude that there is sufficient evidence in the record to support the jury’s determination regarding the first theory of the defense, based upon the “fraudulent incorporation” or Mallela defense, and it is on this basis that we affirm the judgment.
Accordingly, the judgment is affirmed.