[51 NYS3d 551]

Andrew Carothers, M.D., P.C., Appellant, v Progressive Insurance Company, Respondent.

Second Department, April 5, 2017

APPEARANCES OF COUNSEL

*Smith Valliere PLLC*, New York City (*Mark W. Smith* and *Gregory Zimmer* of counsel), for appellant.

*McCormack & Mattei, P.C.*, Garden City (*John E. McCormack* and *Barry I. Levy* of counsel), for respondent.

## OPINION OF THE COURT

DUFFY, J.

New York State law mandates that professional service corporations be owned and controlled only by licensed professionals. In *State Farm Mut. Auto. Ins. Co. v Mallela* (4 NY3d 313 [2005]), the Court of Appeals held that under the no-fault insurance law (Insurance Law § 5101 *et seq.*), an insurance carrier may withhold payment for medical services provided by a professional corporation which has been "fraudulently incorporated" to allow nonphysicians to share in its ownership and control. The primary issue we are called upon to determine, for the first time, is what elements are necessary to establish the defense of fraudulent incorporation recognized by *Mallela*. For the reasons which follow, we find that the jury in this case was properly instructed on the elements of a fraudulent incorporation defense.

Background of the Action

In July 2004, Andrew Carothers, a radiologist, formed a professional service corporation, the plaintiff, Andrew Carothers, M.D., P.C., to perform MRI scans at three existing MRI facilities in Brooklyn, Queens, and the Bronx. The plaintiff leased the three MRI facilities, and all of the medical and office equipment used at the facilities, from companies owned and controlled by nonparty Hillel Sher. In 2005 and 2006, approximately 38,000 MRI scans were performed at the three facilities. The majority of the scans performed were for patients allegedly injured in motor vehicle accidents. These patients assigned their right to receive first-party no-fault insurance benefits to the plaintiff, and the plaintiff billed insurance companies to recover payment on the assigned claims. Because payment was not made in many instances, the plaintiff commenced thousands of actions against insurers, including this action against the defendant, Progressive Insurance Company, to recover unpaid claims of assigned first-party no-fault insurance benefits.

As a defense to nonpayment, the insurers contended that the plaintiff was not entitled to payment of the unpaid claims because, pursuant to *Mallela*, it was fraudulently incorporated. Specifically, the insurers contended that the plaintiff was not solely owned and controlled by Carothers, who was listed on corporate filings as the plaintiff's only owner, shareholder, director, and officer. Rather, the insurers alleged that Carothers was merely a nominal owner, while the plaintiff was actually owned and controlled by the plaintiff's landlord, Hillel Sher, and the plaintiff's executive secretary, Irina Vayman, both nonphysicians. The insurers additionally contended that the plaintiff was not entitled to payment because Carothers did not personally engage in the practice of medicine within the professional corporation, as required by Business Corporation Law § 1507.

Sher and Vayman were both deposed prior to trial. However, both invoked their Fifth Amendment (US Const Fifth Amend) privilege against self-incrimination in response to virtually all the questions posed to them during their respective depositions.

A joint trial was held on actions pending in Kings County and Richmond County between the plaintiff and 53 insurers and self-insurers, including this action. During the course of the lengthy trial, the defendant insurers called several expert witnesses, who provided testimony in support of their claims that the plaintiff's profits were funneled to Sher and Vayman through grossly inflated equipment lease payments made to a company owned and controlled by Sher, and through Vayman's transfers of funds to her own personal accounts. For example, while the plaintiff paid $547,000 per month for two years to lease old MRI equipment, an expert in the field of selling and leasing of MRI equipment testified that the plaintiff could have purchased the same equipment for a onetime payment of $600,000. In addition, the defendants' expert forensic accountant noted that Sher, through one of his companies, leased one of the machines in 2001 for approximately $9,800 per month and then charged the plaintiff $75,000 per month for the same machine. In the forensic accountant's view, the lease agreements between the plaintiff and Sher's companies were not made at arm's length because the terms of those agreements were not mutually beneficial to both parties. To illustrate this point, the forensic accountant noted that the equipment lease permitted Sher to terminate the lease without cause and made

no warranties as to the condition of the equipment. The facilities lease also contained the same one-sided termination provision and provided that, if the equipment lease was terminated, the facilities lease would terminate as well.

The evidence presented by the defendant insurers further showed that Carothers had no real involvement with the management of the plaintiff. Vayman hired all of the personnel and signed all of the checks of the plaintiff's operating account. The only checks that Carothers signed on behalf of the plaintiff were from a new account that was set up around the time that the plaintiff ceased its operation. With respect to that account, Carothers received $52,000 and Vayman and her company received $75,000. The forensic accountant also testified that he found a web of eight different accounts associated with the plaintiff and that he could ascertain no business purpose for that number of accounts. He testified that the plaintiff's money went to Sher's companies each month, leaving no money in the accounts, that no tax returns were filed on behalf of the plaintiff, and that no books or records were maintained on behalf of the plaintiff. According to this expert, $8.7 million from one of the accounts, the plaintiff's operating account, went to one of Sher's companies, Forum Medical Group, and Vayman received $882,600 of those funds, which were immediately transferred from that company's account into Vayman's personal account.

In the two-year period during which the plaintiff operated the practices, Sher and Vayman received a total of $12.2 million, while Carothers earned $133,000.

In contrast, when called to testify, Carothers was unable to account for such transactions. He asserted that the payments to Vayman's personal account were for back wages and payment of corporate expenses and that the only payments for Sher's benefit were to repay a $400,000 bridge loan, for which he presented no proof. Although Carothers testified that a general ledger compiled by an accounting firm in 2007 accounted for all transactions, no general ledger was admitted into evidence. Carothers' testimony also revealed that he did not recognize the names of employees, some of whom were Sher's relatives, and that he lacked knowledge about the operation and finances of the plaintiff.

Although the parties agreed that neither Sher nor Vayman was available to testify at the trial within the meaning of CPLR 3117 (a) (3), the Civil Court, over the plaintiff's objection,

permitted the defense to read the transcripts of their deposition to the jury. The court also charged the jury that an adverse inference could be drawn against the plaintiff based upon the invocation of the Fifth Amendment by Sher and Vayman.

Before the Civil Court delivered its jury charge, the plaintiff requested that the jury be instructed that in order to prove fraudulent incorporation, the defendants were required to prove, by clear and convincing evidence, the traditional elements of common-law fraud, including the element of fraudulent intent. The plaintiff further requested that the jury be charged that the defendants were required to prove that such fraudulent intent was present at the time it was incorporated in July 2004. In addition, the plaintiff requested that the jury be charged on the business judgment rule and instructed to consider the rule in evaluating whether Carothers' decisions were reasonable and whether he engaged in sham transactions as that term is defined under federal tax law. The court denied these requests.

In charging the jury on the fraudulent incorporation defense, the Civil Court instructed the jury that the defendants had to establish that Sher and/or Vayman were de facto owners of the plaintiff or that they exercised substantial control over the plaintiff. To find de facto ownership, the jury was told that it must find that Sher and/or Vayman exercised dominion and control over the plaintiff and its assets, and that they shared risks, expenses, and interests in the profits and losses of the plaintiff. However, the court advised the jury that salary and other compensation and rents should not be considered as profits if it found such salary and leases were negotiated in good faith and were not in actuality a means to channel profits to Sher and/or Vayman. To find control, the jury was instructed that it must find that Sher and/or Vayman had a significant role in the guidance, management, and direction of the plaintiff. In determining the issue of whether Sher and/or Vayman were de facto owners or exercised substantial control over the plaintiff, the jury was instructed to consider the totality of the circumstances and any relevant factor. The court also gave the jury a list of 13 factors it might want to consider, including whether Sher's dealings with the plaintiff were arm's length or were instead designed to give Sher and his companies substantial control over the plaintiff and channel profits to him; whether Sher and Vayman exercised dominion and control over the plaintiff's assets, including the plaintiff's bank accounts;

whether and to what extent the plaintiff's funds were used by Sher and Vayman for personal rather than corporate purposes; whether Sher and Vayman were responsible for the hiring, firing, and payment of salaries of the plaintiff's employees; whether the day-to-day formalities of corporate existence were followed, including the issuance of stock, election of directors, holding of corporate meetings, keeping books and records, and filing tax returns; whether the plaintiff shared common office space and employees with Sher's companies; and whether Carothers played a substantial role in the day-to-day and overall operation and management of the plaintiff.

The jury returned a verdict finding, inter alia, that the defendants proved their defense by clear and convincing evidence, i.e., that the plaintiff was fraudulently incorporated. The jury further found that Carothers was not engaged in the practice of medicine during the time the plaintiff was in business as required by Business Corporation Law § 1507 (a).

The Civil Court denied the plaintiff's motion pursuant to CPLR 4404 (a) to set aside the verdict and for judgment as a matter of law, or, in the alternative, to set aside the verdict as contrary to the weight of the evidence or in the interest of justice and for a new trial, and a judgment was entered in favor of the defendant and against the plaintiff in this action, dismissing the complaint. Upon the plaintiff's appeal, the Appellate Term set aside as contrary to the weight of the evidence so much of the verdict as determined that Carothers failed to practice medicine, but upheld so much of the verdict as found that the plaintiff was fraudulently incorporated, affirming the judgment on that basis (see Andrew Carothers, M.D., P.C. v Progressive Ins. Co., 42 Misc 3d 30 [2013]). The Appellate Term rejected the plaintiff's contention that the Civil Court erroneously instructed the jury on the essential elements of a fraudulent incorporation defense as set forth in Mallela, and determined that it was not error for the Civil Court to set forth a list of factors to assist the jury in determining the issue of whether Sher and Vayman were de facto owners or exercised substantial control over the plaintiff. This Court granted the plaintiff leave to appeal. We affirm the Appellate Term's order insofar as appealed from.

Business Corporation Law

New York State permits licensed professionals to incorporate if they are the sole organizers, owners, and operators of the corporation (see Business Corporation Law §§ 1503 [a], [b];

1508). To incorporate, the licensed individual must obtain a "certificate . . . issued by the [New York State Department of Education (DOE)] certifying that each of the proposed shareholders, directors and officers is authorized by law to practice a profession which the corporation is being organized to practice" (Business Corporation Law § 1503 [b]). The DOE may not issue a certificate of authority to a professional service corporation that does not meet these qualifications (see Education Law § 6507 [4] [c] [i]). Once the professional corporation is formed, shareholders may not transfer their voting power to any person who is not a licensed professional in the field (see Business Corporation Law § 1507 [a]); only shareholders or the licensed professionals engaged in the practice may be directors and officers (see Business Corporation Law § 1508 [a]). Any agreement by a shareholder transferring the voting power of his/her share to individuals who are not authorized by law to practice the profession is void (see Business Corporation Law § 1507 [a]). Thus, New York State law mandates that professional service corporations be owned and controlled only by licensed professionals (see Business Corporation Law §§ 1503 [a]; 1507 [a]; 1508 [a]) and that licensed professionals render the services provided by such corporations (see Business Corporation Law § 1504 [a]). In short, New York State law prohibits unlicensed individuals from organizing a professional service corporation for profit or exercising control over such corporations.

The parties agree that the plaintiff is a professional corporation in the business of providing MRI scanning services at three locations and is subject to the Business Corporation Law.

Governing Provisions of Insurance Law

Pursuant to New York State's Comprehensive Motor Vehicle Insurance Reparations Act (no-fault law), insurers such as the defendant are required to indemnify all covered persons for reasonable and necessary medical services (see Insurance Law §§ 5102, 5104). Insureds or their medical provider assignee are entitled to reimbursement for "basic economic loss" (Insurance Law § 5102 [a] [1]). A provider of healthcare services, however, is not eligible for reimbursement if the provider "fails to meet any applicable New York State or local licensing requirement necessary to perform such service" (11 NYCRR 65-3.16 [a] [12]). The purpose of the regulations is to "combat fraud" (*Allstate Ins. Co. v Belt Parkway Imaging, P.C.*, 33 AD3d 407, 409 [2006]).

The Court of Appeals has interpreted 11 NYCRR 65-3.16 (a) (12) to allow insurance carriers to withhold reimbursement for

no-fault claims "provided by fraudulently incorporated enterprises to which patients have assigned their claims" (*State Farm Mut. Auto. Ins. Co. v Mallela*, 4 NY3d at 319) and to "look beyond the face of licensing documents to identify willful and material failure to abide by state and local law" (*id.* at 321).

In *Mallela*, the Court of Appeals answered a certified question from the United States Court of Appeals for the Second Circuit as to whether a medical corporation that was fraudulently incorporated under Business Corporation Law §§ 1507 and 1508 and Education Law § 6507 (4) (c) was entitled to be reimbursed for assigned no-fault claims (*see id.* at 320). The Court of Appeals answered the question in the negative, determining that a provider which was not solely owned and controlled by physicians, as required by Business Corporation Law §§ 1507 (a) and 1508 (a), was ineligible for no-fault reimbursements, and that insurers may look at the actual ownership and operation of the practice, to wit, whether the practice was actually controlled or owned by an unlicensed individual in violation of state and local law (*see id.* at 321; *United States v Gabinskaya*, 829 F3d 127, 133 [2d Cir 2016]). In this context, however, the Court of Appeals cautioned that insurance carriers could not delay payments of reimbursement claims to pursue investigations unless they had "good cause" (*State Farm Mut. Auto. Ins. Co. v Mallela*, 4 NY3d at 322; *see* 11 NYCRR 65-3.2 [c]; *Dynamic Med. Imaging, P.C. v State Farm Mut. Auto. Ins. Co.*, 29 Misc 3d 278, 285 [Nassau Dist Ct 2010]) and that, in the licensing context, "carriers will be unable to show 'good cause' unless they can demonstrate behavior tantamount to fraud" (*State Farm Mut. Auto. Ins. Co. v Mallela*, 4 NY3d at 322). The Court further cautioned that "[t]echnical violations will not do. For example, a failure to hold an annual meeting, pay corporate filing fees or submit otherwise acceptable paperwork on time will not rise to the level of fraud" (*id.*).

Jury Charge at Issue

On appeal to this Court, the plaintiff maintains that the Civil Court's jury charge on fraudulent incorporation was improper because it permitted the jury to make a finding of fraudulent incorporation without a showing that Carothers possessed fraudulent intent at the time he incorporated the plaintiff, or engaged in criminal or fraudulent behavior. The plaintiff also contends that the Civil Court erred in setting

forth a list of 13 factors the jury could consider in determining whether Sher and Vayman were de facto owners of the plaintiff or exercised substantial control over it. The plaintiff asserts that the list of factors impermissibly allowed the jury to consider "technical violations" of corporate formalities such as the failure to hold annual meetings, and administrative activities routinely performed by office managers, such as paying personnel. The plaintiff additionally argues that the Civil Court erred in denying its requests for charges on the business judgment rule and sham transactions.

■ Contrary to the plaintiff's contention, the jury charge on fraudulent incorporation, read as a whole, adequately conveyed the correct legal principles articulated by the Court of Appeals in *Mallela* (*see Nestorowich v Ricotta*, 97 NY2d 393, 401 [2002]; *Hatzis v Buchbinder*, 112 AD3d 890, 890 [2013]; *Winderman v Brooklyn/McDonald Ave. Shoprite Assoc., Inc.*, 85 AD3d 1018, 1019 [2011]). As the Appellate Term correctly determined, the charge properly focused the jury on the question of whether Carothers was a mere nominal owner of the plaintiff, and if, in actuality, nonphysicians Sher and Vayman owned or controlled the plaintiff such that the profits were funneled to them. The Civil Court properly instructed the jury to consider whether Sher and/or Vayman shared in the profits of the plaintiff, and that the jury could consider whether the leases entered into between the plaintiff and Sher's companies were arm's length or meant to funnel profits to Sher. The Civil Court charged the jury that, in order to succeed on its defense, the defendant was required to establish, by clear and convincing evidence, that Sher and/or Vayman, two nonphysicians, were "de facto owners" of the plaintiff or exercised "substantial control" over the plaintiff; and that to find de facto ownership, the jury must find that either Sher and/or Vayman exercised "dominion and control over" the plaintiff and its assets and that they "shared the risks, expenses, and interest in the profits and losses" of the plaintiff. To find control, the jury was instructed that they must find that Sher and/or Vayman had a "significant role in the guidance, management, and direction of the business." The court also sufficiently explained the relevant definitions of these terms.

Although the plaintiff is correct that certain of the factors enumerated in the non-exhaustive list of factors with which the jury was charged that it might wish to consider, could not, standing alone, support a finding of fraudulent incorporation,

these factors were relevant for the jury to consider in determining the ultimate issues of de facto ownership and substantial control, and the jury was properly instructed to consider the totality of the circumstances (*see United States v Gabinskaya*, 829 F3d at 132). For example, the fact that Vayman controlled the plaintiff's bank accounts and was responsible for hiring and paying employees could not, on its own, support a finding that she owned and controlled the plaintiff. However, since the jury was instructed to look to the totality of the circumstances to determine whether Sher and/or Vayman were de facto owners or exercised substantial control over the plaintiff, factors such as Vayman's control of the bank accounts and Carothers' limited day-to-day management were relevant to that issue. Likewise, although *Mallela* instructed that "[t]echnical violations" such as a failure to hold an annual meeting, pay corporate filing fees, or submit paperwork on time would not establish the defense of fraudulent incorporation (*State Farm Mut. Auto. Ins. Co. v Mallela*, 4 NY3d at 322), a failure to follow corporate formalities is a relevant factor for the jury to consider, in conjunction with other factors, in determining the ultimate issue of ownership and control and whether the plaintiff was a proper professional corporation or merely a vehicle operated by nonphysicians to funnel profits to themselves.

Further, the Civil Court did not err in declining to instruct the jury as to common-law fraud, fraudulent intent at the time of incorporation, and the business judgment rule. *Mallela* involved fraud "in the corporate form" rather than the more traditional forms of common-law fraud (*id.* at 320). With respect to fraudulent intent at the time of incorporation, *Mallela* instructs that even if a professional corporation did not intend to yield control to unlicensed parties at the time of incorporation, it nonetheless would be ineligible for no-fault reimbursement if the nominal physician owner yielded control of the corporation at some later date (*see id.* at 322). Good faith compliance with the requirements of a professional corporation at the time of incorporation does not end when the certificate of incorporation is filed and does not defeat a claim of fraudulent incorporation if the evidence demonstrates that at some point after the initial incorporation, the nominal physician owner turned over control of the business to nonphysicians in contravention of state regulations (*see id.*). Similarly, with respect to the plaintiff's requested charge as to the business judgment rule, which is typically charged in actions alleging a

breach of fiduciary duty and bars inquiry into actions of corporate directors taken in good faith in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes (see *Auerbach v Bennett*, 47 NY2d 619, 629 [1979]; *Mobarak v Mowad*, 117 AD3d 998, 999-1000 [2014]), the evidence presented at the trial did not support such a charge. Carothers failed to account for the vast majority of funds transferred by Vayman from the plaintiff to her personal account and to Sher's companies. Further, Carothers provided no proof in support of his testimony that payments made to Sher were for the purpose of repaying a $400,000 bridge loan. Moreover, Carothers' testimony displayed his almost complete lack of knowledge about the operation and finances of the plaintiff. In short, there was no evidentiary basis for a business judgment rule charge under the facts elicited at trial (see *generally Dotson v City of New York*, 296 AD2d 372, 372-373 [2002]; *Mejia v Coleman*, 168 AD2d 245, 246 [1990]). Accordingly, the Civil Court properly declined to give the plaintiff's requested charges on common-law fraud, fraudulent intent, and the business judgment rule.

Finally, the Civil Court properly denied the plaintiff's request to charge the jury, in accordance with federal tax law, that a "sham transaction" is one that has no business purpose or economic substance (see *DeMartino v Commissioner of Internal Revenue*, 862 F2d 400, 406 [2d Cir 1988]). Nonetheless, the jury was properly instructed that salary and lease payments should not be considered as profits if it found that they were negotiated in good faith and were not in actuality a means to funnel profits to nonphysicians.

In sum, the jury charge, read as a whole, adequately conveyed the correct legal principles on "fraudulent incorporation" as established by *Mallela*. The instructions asked the jury to consider whether, under the totality of the circumstances, the plaintiff was operating as a proper professional medical corporation in compliance with state regulations or whether, in order to obtain money that insurers were otherwise entitled to deny, the plaintiff was organized under the facially valid cover of Carothers but was, in actuality, operated and controlled by Sher and Vayman to funnel profits to themselves.

Harmless Error

■ While a party's invocation of the privilege against self-incrimination can generally be used to draw an adverse inference against that party in a civil action (see *Marine Midland*

*Bank v Russo Produce Co.*, 50 NY2d 31, 42-43 [1980]), no such inference may be drawn where, as here, the privilege is invoked by a nonparty witness (*see Access Capital v DeCicco*, 302 AD2d 48, 52 [2002]; *State of New York v Markowitz*, 273 AD2d 637, 646 [2000]). Accordingly, the Appellate Term properly determined that the Civil Court erred in permitting the defendants to read into evidence the transcripts of the depositions of Sher and Vayman, in which they invoked their Fifth Amendment privilege against self-incrimination and declined to answer questions, and in instructing the jury that it could draw an adverse inference against the plaintiff based on their refusal to answer questions (*see Access Capital v DeCicco*, 302 AD2d at 52; *State of New York v Markowitz*, 273 AD2d at 646). However, given the evidence adduced at trial, the error could not have affected the outcome of the trial, and thus was harmless (*see* CPLR 2002; *see generally Parris v New York City Tr. Auth.*, 140 AD3d 938, 940 [2016]; *Rizzuto v Getty Petroleum Corp.*, 289 AD2d 217, 218 [2001]).

In evaluating whether the error in permitting the deposition testimony to be read into evidence affected the outcome of the trial, we note as an initial matter that the jury determined that the defendant established fraudulent incorporation by clear and convincing evidence (*see Tahir v Progressive Cas. Ins. Co.*, 12 Misc 3d 657, 662-663 [Civ Ct, NY County 2006]; *cf. Gaidon v Guardian Life Ins. Co. of Am.*, 94 NY2d 330, 350 [1999]). In light of the jury's determination that the evidence at trial met this more stringent standard of proof than required by the preponderance of the evidence standard, we do not reach the issue of which is the appropriate standard of proof in establishing the defense of fraudulent incorporation (*see e.g. Matter of State of New York v Dennis K.*, 27 NY3d 718, 742 [2016]). Nonetheless, the evidence clearly favored a verdict in the defendant's favor. The evidence demonstrated that Carothers was merely the nominal owner of the plaintiff and that the plaintiff was actually owned and controlled by nonphysicians Sher and Vayman, who funneled the plaintiff's profits to themselves, and that the outcome of the trial would have been the same absent the error arising from the charge relating to the invocation by Sher and Vayman of the right against self-incrimination pursuant to the Fifth Amendment.

In light of the overwhelming evidence establishing fraudulent incorporation, the error arising from the charge pertaining to the invocation by Sher and Vayman of the right against self-

incrimination pursuant to the Fifth Amendment was harmless and the judgment was properly affirmed.

The plaintiff's remaining contention is without merit.

Accordingly, the order is affirmed insofar as appealed from.

LEVENTHAL, J.P., MILLER and MALTESE, JJ., concur.

Ordered that the order is affirmed insofar as appealed from, with costs.