# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 39
Andrew Carothers, M.D., P.C., &c.,
     Appellant,
    v.
Progressive Insurance Company,
     Respondent.

Bruce H. Lederman, for appellant.
Barry I. Levy, for respondent.
Coalition Against Insurance Fraud; New York State Department of Financial Services, amici curiae.

FAHEY, J.:

Only licensed physicians may practice medicine in New York. The unlicensed are not bound by the ethical rules that govern the quality of care delivered by a physician to a

patient.  By statute, regulation, and the common law, the corporate form cannot be used as a device to allow nonphysicians to control the practice of medicine.

In State Farm Mut. Auto. Ins. Co. v Mallela (4 NY3d 313 [2005]), we held that, pursuant to 11 NYCRR 65-3.16 (a) (12), an insurer may withhold payment for medical services provided by a professional corporation when there is "willful and material failure to abide by" licensing and incorporation statutes (Mallela, 4 NY3d at 321).  Today we clarify that Mallela does not require a finding of fraud for the insurer to withhold payments to a medical service corporation improperly controlled by nonphysicians.  The trial court did not err in declining to give a charge requiring the jury to find fraudulent intent or conduct "tantamount to fraud" (id. at 322), in order to reach a verdict in favor of the insurers.

I.

The factual background is essential in understanding our legal conclusion.  The plaintiff in this case, Andrew Carothers, M.D., P.C., a professional service corporation, was formed by Andrew Carothers, M.D., a radiologist, in 2004.  The company provided magnetic resonance imaging (MRI) services.  Plaintiff was incorporated after Carothers met Hillel Sher, a nonphysician who owned and controlled two companies that together held long-term leases for three, fully equipped, operational MRI facilities in New York City.  They had been introduced by an MRI equipment repair technician who knew that Carothers was in financial distress and that Sher was "looking for a doctor."  In 2005-2006, plaintiff subleased the facilities and associated equipment from Sher's companies.

Specifically, plaintiff agreed in January 2005 to lease the premises and MRI equipment for a fee comprised of $547,000 per month for the equipment[1] and $30,000 per month for the three premises. Sher had the right to terminate each lease without cause, regardless of payment, on 30 days' notice. No similar provision allowed plaintiff to terminate the leases without cause. Indeed, the leases contained clauses whereby they automatically renewed unless terminated by Sher, giving plaintiff no exit.

The rental fees charged to plaintiff for the MRI equipment were exorbitant. For example, a piece of equipment that one of Sher's companies leased from a third party for a monthly payment of $5,950 was leased to plaintiff for $75,000 per month. Indeed, Sher's companies charged plaintiff far more per year to rent the MRI machines, which were about 10 or 11 years old, than it would have cost to buy them outright. There was trial testimony that for two months' rent charged by Sher in one of the equipment leases, a company could have owned a similar used MRI unit. As of December 2004, plaintiff could have bought used equipment to replace all the MRI equipment in the leases for less than $600,000. This amount is not significantly more than plaintiff paid each month to lease the equipment. All in all, the difference between the fair market value of six MRI scanners and what Sher charged plaintiff in one year to rent them was $4,680,000. Similarly, plaintiff paid $60,000 per year to lease nine used fax machines, even though the company could have purchased scores of new machines every year for that price.

---

[1] In this opinion, we use the figures given by the Appellate Division.

Carothers opened a bank account on behalf of plaintiff. It was at the bank that Sher introduced Carothers to Irina Vayman, another nonphysician, whom Carothers hired as plaintiff's executive secretary. Carothers never wrote a check from the bank account; Vayman would write the checks.

At the MRI facilities, Carothers's oversight of the provision of medical services was practically nonexistent. Prior to signing the leases, Carothers did not seek out the referring physicians who generated patient traffic to the practices, and it was Vayman, not Carothers, who subsequently had contact with those physicians. Patient care protocols had already been set up by Carothers's predecessor. Carothers was not involved in evaluating or disciplining employees. Carothers rehired a second radiologist, who had worked for Carothers's predecessor, to interpret scans, and Carothers himself reviewed at most 79 reports out of a total of some 38,000.

At trial, an expert on radiology practice testified that "there was absolutely no quality control; there was no supervision; . . . the reports did not reflect [the] reality [of] what the films showed" (R743), and "the quality of what was being produced . . . was abysmal." The expert opined that "what was being done here was not being done with an eye towards producing any kind of a quality product. This was . . . being done to sort of get an image on the film. And those images are not the images that would lend themselves towards being highly diagnostic types of examinations. . . . [A] lot of the images are replete with a tremendous amount of artifacts that reflect . . . inadequate equipment performance."

Most of the scans performed at plaintiff's facilities were of patients allegedly injured in motor vehicle accidents. The patients assigned their rights to receive first-party no-fault

insurance benefits to plaintiff, which billed insurance companies to recover payment on the assigned claims. Sher introduced Carothers to an entity named Medtrex, with which plaintiff entered into a loan and security agreement. Vayman, not Carothers, was the authorized borrower's representative on the Medtrex agreement. Medtrex advanced loans to plaintiff on a weekly basis. Payments from the insurance companies were then used to pay back Medtrex's loans and pay its fees.

Carothers's salary, at $133,000 from January 2005 through December 2006, was lower than that of plaintiff's executive secretary, Vayman, who earned $120,000 a year. Throughout her employment, Vayman transferred large sums of money from plaintiff's bank account to her own personal bank account and used plaintiff's account to cover expenses such as lease payments on her car and water bills on a house in Las Vegas owned by Sher. Even larger sums were transferred from plaintiff's account to an account of Sher's. Carothers eventually opened two more accounts in plaintiff's name to facilitate payments made by Vayman and Sher, including wire transfers to overseas accounts totaling $2,900,000. A certified public accountant who had conducted a "forensic investigation" of plaintiff testified at trial that some $12,200,000 was funneled through plaintiff to Sher and Vayman.

Vayman introduced Carothers to a tax preparer, whom Carothers hired to file tax returns for plaintiff. Sher's telephone number, not Carothers's, was listed on plaintiff's tax return. The filed return contained egregious errors, such as a deduction taken for fictitious management fees in excess of $1,000,000. At trial, the accountant who had conducted the

forensic investigation of plaintiff testified that it had "no books and records," such as financial statements, ledgers, and invoices.

Insurance companies stopped paying plaintiff's no-fault claims in 2006. Although Carothers had not personally guaranteed the leases, he did personally guarantee the Medtrex loans and he ended up owing that company over $7,000,000. Plaintiff closed in December 2006 after Medtrex refused to make any more advances.

## II.

The procedural history begins with multiple collection actions filed by plaintiff against the insurance carriers, in the Civil Court of the City of New York, seeking to recover unpaid claims of assigned first-party no-fault insurance benefits. The carriers' defense is that plaintiff was not eligible to seek reimbursement of the insurance benefits under 11 NYCRR 65-3.16 (a) (12) (stating that "[a] provider of health care services is not eligible for reimbursement . . . if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York"), because it was controlled by unlicensed nonphysicians (see Business Corporation Law §§ 1507 & 1508 [requiring all shareholders, officers, and directors of a professional service corporation to be "individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation or a predecessor entity, or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued"]). The defendants also relied on our decision in State Farm Mut. Auto. Ins. Co. v Mallela, which held, in light of the above-cited provisions, that

insurance carriers may withhold payment for medical services provided by "fraudulently incorporated" enterprises to which patients have assigned their claims, regardless of the quality of care such entities have provided.

The defendants contended that Carothers was merely a nominal owner of plaintiff, and that the professional corporation was actually owned and controlled by Sher and Vayman, who were not physicians. They also maintained that plaintiff was not entitled to payment because Carothers, the shareholder with a medical license, did not personally engage in the practice of medicine through the professional corporation.

At their depositions, Sher and Vayman invoked their Fifth Amendment privileges against self-incrimination and refused to answer almost all the questions, numbering in the hundreds, posed to them by the defendants. Specifically, in response to each question (other than identifying themselves), Sher and Vayman answered, simply, "Fifth." By way of examples, Sher and Vayman responded in that manner to the following questions: "Are you [Sher] the owner of [plaintiff]?"; "Did you [Sher] pay Dr. Carothers money in exchange for the use of his professional license in order to operate [plaintiff]?"; "Did you [Sher] ever charge [plaintiff] fair market value for the use of MRI machines at the facilities where [plaintiff] conducted its business?" "Mr. Sher, did you exercise any control over the entity known as [plaintiff]?"; "Are you [Vayman] a part owner of [plaintiff]?"; "Is Hillel Sher a part owner of [plaintiff]?"

The cases, involving 54 insurance carriers, were consolidated and a joint trial was held in Civil Court. The parties stipulated that Sher and Vayman were not available to

testify at trial within the meaning of CPLR 3117 (a) (3).[2] Plaintiff moved to preclude the insurance companies from reading into evidence the depositions of Sher and Vayman in which they had serially invoked their Fifth Amendment privileges, on the ground that the invocation of the Fifth Amendment by a nonparty could not be used against a party. Civil Court denied the motion.

In opening remarks, the lead defense counsel told the jury that it would not hear from Sher and Vayman "because both of those witnesses chose to take the [F]ifth [A]mendment privilege against self-incrimination." As the first piece of evidence presented, Sher's entire deposition testimony was read to the jury, including his repeated invocations of the Fifth Amendment. The same approach was taken with Vayman's deposition testimony. Plaintiff's counsel objected.

During the trial, the jury heard from multiple witnesses whose testimony supported the defendants' assertions that plaintiff's profits were funneled to Sher and Vayman, through grossly inflated equipment lease payments to Sher's companies and through the transfer of plaintiff's funds to personal accounts. The accountant who had conducted a forensic investigation of plaintiff opined that "Dr. Carothers was not in control of [plaintiff] as a true business owner would be. . . . [H]e was not actively involved in the operations or the financial aspects of the company. . . . [T]he core business assets . . . were owned and controlled by Hillel Sher. . . . Hillel Sher not only controlled the company, but profited from the monies that were in [plaintiff] . . . . Dr. Carothers, based on everything that I read,

---

[2] CPLR 3117 (a) (3) states conditions under which "the deposition of any person may be used" at a trial due to the witness's unavailability.

did no due diligence that a true business owner would before he signed leases for millions of dollars. . . . [S]ince a medical practice is the only way you can bill an insurance company, [plaintiff] was used as a vehicle to siphon money to Sher and Vayman . . ." In the expert's view, the lease agreements between plaintiff and Sher's companies were not made at arm's length, because the terms of those agreements were not mutually beneficial to both parties.

Carothers himself testified, but he was not able to account for the transactions described by the other witnesses called by the insurance carriers. He suggested that the payments to Vayman's personal account were for back wages and payment of corporate expenses and that the only payments for Sher's benefit were to repay a $400,000 bridge loan, for which he presented no proof. Although he testified that a general ledger compiled by an accounting firm in 2007 accounted for all transactions, no such ledger was admitted into evidence.

During summation, the insurance carriers' counsel repeatedly mentioned that Sher and Vayman had invoked their Fifth Amendment privileges.

Plaintiff's counsel requested that the court give a jury instruction on "the traditional elements of fraud," including fraudulent intent, on the theory that Mallela allows insurers to withhold payments, under 11 NYCRR 65-3.16 (a) (12), only in situations where the professional corporation's ostensible or real managers engaged in conduct "tantamount to fraud" (Mallela, 4 NY3d at 322). The trial court denied the request and the jury charge contained no instruction on fraudulent intent or the elements of fraud. The court told the jury that it could "find that [plaintiff] was fraudulently incorporated" if it concluded "that

reasonable people would say that Mr. Sher and/or Miss Vayman were de facto . . . owners of the corporation or that they exercised substantial control over the corporation." The jury could "look beyond the certificate of incorporation." The trial court further instructed the jury that "[t]o find that Mr. Sher and or Miss Vayman were de facto owners of [plaintiff], [the jury] must find that they exhibited the attributes of ownership particularly that they exercised dominion and control over the corporation and its assets and that they shared risks, expenses, and interest in the profits and losses of the corporation." The jury was instructed that, in order to find that Sher and Vayman "exercised substantial control over the corporation," it "must find that they had a significant role in the guidance, management and direction of the business of the corporation." The trial court then enumerated 13 factors that the jury might consider relevant in deciding whether Sher and Vayman were de facto owners of or exercised substantial control over plaintiff. The court also required the jury to decide whether Carothers was engaged in the practice of medicine through plaintiff, within the meaning of Business Corporation Law § 1507.

In the course of its instructions, Civil Court charged the jury that it could, but was not obliged to, draw an adverse inference against plaintiff on the basis of the invocations by Sher and Vayman of their Fifth Amendment rights, but could not rely on such an adverse inference as the only basis for concluding that plaintiff was not solely owned or controlled by Carothers.

The jury found that the defendants had proved that plaintiff was "fraudulently incorporated" and that Carothers did not engage in the practice of medicine through plaintiff in 2005-2006.

Plaintiff moved under CPLR 4404 (a) to set aside the verdict and for judgment as a matter of law or in the alternative to set aside the verdict as against the weight of the evidence or in the interest of justice and for a new trial.  Plaintiff contended that the trial court erred by failing to instruct the jury regarding the elements of fraud and in particular by failing to instruct the jury that the defendants must have established that there was a fraudulent intent at the time of plaintiff's incorporation.  Plaintiff also argued that it was error for Civil Court to set forth the particular list of factors it gave to assist the jury in determining whether Sher and Vayman were de facto owners of or exercised substantial control over the plaintiff.  Additionally, plaintiff contended that it was error to permit Sher's and Vayman's deposition testimony to be read to the jury, because any probative value of reading the depositions was outweighed by its prejudicial effect, and that this error was further compounded by the court's instruction that the jury could draw an adverse inference against plaintiff based upon the invocations of Fifth Amendment privileges. Finally, plaintiff challenged the verdict that Carothers had not practiced medicine through plaintiff, as contrary to the weight of the evidence.[3]

The trial court denied plaintiff's motion (26 Misc 3d 448 [Civ Ct, Richmond Co 2009]).  It was then agreed, by a so-ordered stipulation, that, with the exception of one action against defendant Progressive Insurance Company (Progressive), judgments would

---

[3] Plaintiff also maintained that a decision by the trial court to preclude evidence of some $18 million in accounts receivable allegedly owed to plaintiff by the insurance companies prejudiced plaintiff's ability to respond to the fraudulent incorporation defense.  That argument was properly rejected by the lower courts.

not be entered, pending the disposition of the appeal.  Accordingly, Civil Court entered a single judgment in favor of Progressive and against plaintiff, dismissing the complaint.

The Appellate Term affirmed Civil Court's judgment dismissing the complaint, insofar as appealed from (42 Misc 3d 30 [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2013]).  The appellate court set aside, as contrary to the weight of the evidence, so much of the verdict as determined that Carothers failed to practice medicine, but upheld so much of the verdict as found that the plaintiff was fraudulently incorporated, affirming the judgment on that basis.

The Appellate Term held that Civil Court erred in permitting the defense to read the deposition transcripts of Sher and Vayman to the jury, in which those witnesses repeatedly invoked the Fifth Amendment.

> "The error was compounded by the repeated references to the nonparties' depositions in the defense summation to the jury, and in the decision of the court to charge an adverse inference.  While it is proper for the court to give such an instruction to the jury in a civil action when a party invokes his or her Fifth Amendment privilege, generally, the adverse inference is inappropriate when it is based on a nonparty's decision to remain silent." (Id. at 44-45 [citations omitted].)

The Appellate Term reasoned, however, that the errors were harmless under CPLR 2002, on the basis that the outcome of the trial, on the question whether plaintiff was in violation of the requirement that it be owned and controlled solely by licensed professionals, "would have been the same notwithstanding [the] errors" (id. at 45-46).

The Appellate Term upheld Civil Court's jury charge.

> "Although both the United States Court of Appeals for the Second Circuit and New York's Court of Appeals employed the term 'fraudulently incorporated' in the Mallela case, which was the term used in the certified

question, the essence of the defense in that case, as here, was the provider's 'lack of eligibility,' which does not require a finding of fraud or fraudulent intent, but rather, addresses the actual operation and control of a medical professional corporation by unlicensed individuals.

"[A] reading of the Mallela case demonstrates that the case involved fraud 'in the corporate form,' rather than the more traditional forms of common-law fraud." (Id. at 40-41 [citation omitted].)

Plaintiff appealed to the Appellate Division, pursuant to permission granted by that court. Progressive did not appeal.

The Appellate Division affirmed the Appellate Term's order insofar as appealed from (150 AD3d 192 [2d Dept 2017]).

The Appellate Division upheld the Appellate Term's holding that Civil Court erred in permitting the defendants to read the transcripts into evidence and in instructing the jury that it could draw an adverse inference, and agreed with the Appellate Term majority that the error could not have affected the outcome of the trial and therefore was harmless. The Appellate Division reasoned that there was "overwhelming evidence" that "Carothers was merely the nominal owner of the plaintiff and that the plaintiff was actually owned and controlled by nonphysicians Sher and Vayman, who funneled the plaintiff's profits to themselves, and . . . the outcome of the trial would have been the same absent the error" (id. at 204).

In addition, the Appellate Division held that Civil Court properly declined to give plaintiff's requested charges on common-law fraud and fraudulent intent.

"Mallela involved fraud 'in the corporate form' rather than the more traditional forms of common-law fraud. With respect to fraudulent intent at the time of incorporation, Mallela instructs that even if a professional corporation did not intend to yield control to unlicensed parties at the time of incorporation, it nonetheless would be ineligible for no-fault reimbursement

if the nominal physician owner yielded control of the corporation at some later date. Good faith compliance with the requirements of a professional corporation at the time of incorporation does not end when the certificate of incorporation is filed and does not defeat a claim of fraudulent incorporation if the evidence demonstrates that at some point after the initial incorporation, the nominal physician owner turned over control of the business to nonphysicians in contravention of state regulations." (Id. at 202.)

The Appellate Division rejected plaintiff's challenge to Civil Court's list of 13 factors and its remaining contentions.

Plaintiff moved at the Court of Appeals for leave to appeal. We dismissed the motion on the basis that the Court of Appeals does not have jurisdiction to entertain a motion for leave to appeal from an order commenced in Civil Court (29 NY3d 1047 [2017]). Plaintiff then moved at the Appellate Division for leave to appeal to this Court. The Appellate Division granted plaintiff's motion, certifying the question whether its opinion and order was properly made (2017 NY Slip Op 90794[U]). We subsequently denied a motion by Progressive to dismiss the appeal (32 NY3d 1073 [2018]).

III.

In New York, a professional service corporation may be owned and controlled only by licensed professionals (see Business Corporation Law § 1507). Moreover, licensed professionals are permitted to incorporate only if they are the sole organizers, owners, and operators of the professional corporation (see Business Corporation Law §§ 1503 [a], [b]; 1508). To incorporate, the licensed individual must obtain a "certificate . . . issued by the [New York State Department of Education] certifying that each of the proposed shareholders, directors and officers is authorized by law to practice a profession which the corporation is being organized to practice" (Business Corporation Law § 1503 [b]), and the

Department of Education may not issue a certificate of authority to a professional service corporation unless it meets these qualifications (see Education Law § 6507 [4] [c] [i]). Once the professional corporation is formed, shareholders may not transfer their voting power to any person who is not a licensed professional in the field (see Business Corporation Law § 1507 [a]); only shareholders or licensed professionals engaged in the practice may be directors and officers (see Business Corporation Law § 1508 [a]).

New York law prohibits unlicensed individuals from organizing a professional service corporation for profit or exercising control over such entities. In the medical context, the underlying policy concern is "that the so-called 'corporate practice of medicine' could create ethical conflicts and undermine the quality of care afforded to patients" (State Farm Mut. Auto. Ins. Co. v Mallela, 372 F3d 500, 503 [2d Cir 2004]). Control of medical service corporations by unlicensed individuals leads to higher costs, less effective medical treatment, and mistrust of the no-fault insurance system. More generally, the common law in New York has long recognized the need to ensure that providers of professional services are not unduly influenced by unlicensed third parties who are free of professional responsibility requirements and may disregard patient care in operating a "corporation . . . organized simply to make money" (Matter of Co-operative Law Co., 198 NY 479, 484 [1910]).

In State Farm Mut. Auto. Ins. Co. v Mallela, this Court held that, under 11 NYCRR 65-3.16 (a), a regulation adopted by the Commissioner of Insurance pursuant to New York's "no-fault" insurance laws (see Insurance Law § 5101 et seq.), insurance carriers may withhold payment for medical services provided by a professional corporation that

has been "fraudulently incorporated."  There, we considered a certified question from the United States Court of Appeals for the Second Circuit: whether "a medical corporation that was fraudulently incorporated under [] Business Corporation Law §§ 1507, 1508, and [] Education Law § 6507 (4) (c) [is] entitled to be reimbursed by insurers, under [] Insurance Law §§ 5101 et seq., and its implementing regulations, for medical services rendered by licensed medical practitioners" (Mallela, 372 F3d at 510).  We answered the question in the negative, determining that a provider that was not solely owned and controlled by physicians was not eligible for no-fault insurance reimbursements.

The Mallela decision interpreted 11 NYCRR 65-3.16 (a) (12) to allow insurance carriers to withhold reimbursement for no-fault claims that are "provided by fraudulently incorporated enterprises to which patients have assigned their claims" (Mallela, 4 NY3d at 319).  In Mallela, nonphysicians paid physicians to use their names on paperwork to establish medical service corporations, and the nonphysicians then operated the companies, while billing the physicians inflated rates so that profits were channeled to them.  The nonphysicians contended that the professional corporations were "entitled to reimbursement even if fraudulently licensed" (id. at 321).  The Mallela Court rejected the argument, reasoning that if this were so, reimbursement would go "to the medical service corporation that exists to receive payment only because of its willfully and materially false filings with state regulators" (id.).  In our holding, this Court clarified that insurers may "look beyond the face of licensing documents to identify willful and material failure to abide by state and local law," such as actual ownership or operation of the practice by an unlicensed individual (id.).

The <u>Mallela</u> Court warned insurance carriers, however, that insurers could not delay payments of reimbursement claims to pursue investigations unless they had "good cause" (<u>id.</u> at 322; <u>see</u> 11 NYCRR 65-3.2 [c]) and that "[i]n the licensing context, carriers will be unable to show 'good cause' unless they can demonstrate behavior tantamount to fraud" (<u>Mallela</u>, 4 NY3d at 322). The Court further cautioned that "[t]echnical violations will not do. For example, a failure to hold an annual meeting, pay corporate filing fees or submit otherwise acceptable paperwork on time will not rise to the level of fraud" (<u>id.</u>).

Plaintiff, citing our language in <u>Mallela</u>, contends that the trial court erred in denying its request to instruct the jury that it had to find fraudulent intent or, at least, conduct "tantamount to fraud." We conclude that there was no error. Neither 11 NYCRR 65-3.16 (a) (12) nor our interpretation of that regulation in <u>Mallela</u> requires that an insurance carrier, seeking to demonstrate that a professional service corporation engaged in corporate practices that violate Business Corporation Law § 1507, Business Corporation Law § 1508, or Education Law § 6507 (4) (c), show that the professional service corporation or its managers engaged in common-law fraud. We drew the term "fraudulently incorporated" from the Second Circuit's certified question, but the term may be misleading. A corporate practice that shows "willful and material failure to abide by" licensing and incorporation statutes (<u>Mallela</u>, 4 NY3d at 321) may support a finding that the provider is not an eligible recipient of reimbursement under 11 NYCRR 65-3.16 (a) (12) without meeting the traditional elements of common-law fraud.

Nor is a jury required to evaluate the extent to which corporate misconduct approximates fraud. The no-fault insurance regulations make providers ineligible for

reimbursement when their violations of the cited statutes are more than merely technical and "rise to the level of" a grave violation such as fraud (id. at 322). Insurance carriers do not have good cause to delay or deny payments of reimbursement claims on the basis of a provider's slight divergence from licensing requirements. Here, the jury's finding that plaintiff was in material breach of the foundational rule for professional corporation licensure – namely that it be controlled by licensed professionals – was enough to render plaintiff ineligible for reimbursement under 11 NYCRR 65-3.16 (a) (2). The trial court committed no error in refusing to issue a charge requiring a "tantamount to fraud" finding by the jury.[4]

Plaintiff also suggests that in Mallela the corporate misconduct was more egregious than here, in that Mallela's company had pleaded guilty to billing fraud and Mallela had surrendered his license. We can discern no salient factual difference between Mallela and this appeal that would justify a distinct analysis. The allegations in Mallela were very similar to the evidence presented at trial here; both cases involve alleged funneling of profits to nonphysicians who owned companies that billed the professional corporation inflated rates. Our decision in Mallela was not based on fraudulent billing. In fact, we did not mention in our opinion that Mallela had pleaded guilty to that charge.

---

[4] We reject plaintiff's argument that it was error for Civil Court to set forth the particular list of factors it gave to assist the jury in determining whether Sher and Vayman were de facto owners of or exercised substantial control over plaintiff. Although we do not endorse the trial court's specific list of factors, in this case the trial court's charge satisfactorily directed the jury to the ultimate inquiry of control over a professional corporation.

Finally, plaintiff is incorrect to characterize the improper control of plaintiff by unlicensed persons as simply an instance of improper fee splitting of the professional corporation's profits with a nonphysician in violation of 8 NYCRR 29.1 (b) (4). Although the Appellate Division held in Matter of Allstate Prop. & Cas. Ins. Co. v New Way Massage Therapy P.C. (134 AD3d 495, 495 [1st Dept 2015], lv denied 28 NY3d 909 [2016]) that a "fee-sharing arrangement . . . does not constitute a defense to a no-fault action," the jury in this case determined that plaintiff was controlled by unlicensed persons, rather than merely splitting fees with them. Control of a professional corporation by nonprofessionals violates foundational New York licensing requirements and rendered plaintiff ineligible for insurer reimbursement, for exactly the same reason the medical service corporation in Mallela was ineligible for reimbursement.

IV.

Plaintiff's other principal contention is that the trial court erred in admitting the deposition testimony in which Sher and Vayman repeatedly invoked the Fifth Amendment and in giving the jury an adverse inference instruction.

While the Fifth Amendment accords an individual the privilege not to answer questions in a civil proceeding if the answers might incriminate the person in future criminal proceedings (see Baxter v Palmigiano, 425 US 308, 316 [1976]), a witness who asserts this Fifth Amendment privilege in a civil trial is not necessarily protected from consequences in the same manner as in a criminal trial. This Court has held that, in a civil case, failure to answer questions by a witness who is a party "may be considered by a jury in assessing the strength of evidence offered by the opposite party on the issue which the

witness was in a position to controvert" (<u>Marine Midland Bank v Russo Produce Co.</u>, 50 NY2d 31, 42 [1980]). In a civil trial, "an unfavorable inference may be drawn against a party from the exercise of the privilege against self-incrimination" (Prince, Richardson on Evidence § 5-710). We have not previously decided whether a <u>nonparty's</u> invocation of the Fifth Amendment may trigger an adverse inference instruction against a party in a civil case, and we have no occasion to do so here because any error by the trial court was harmless (<u>see</u> CPLR 2002). There is no reasonable view of the evidence under which plaintiff could have prevailed (<u>see</u> <u>Marine Midland Bank</u>, 50 NY2d at 43). We agree with the Appellate Division that, based on the trial evidence, the jury could rationally infer only one conclusion: plaintiff was in violation of the requirement of Business Corporation Law § 1507 that a professional service corporation be owned and controlled solely by licensed professionals.

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question not answered as unnecessary.

* * * * * * * * * * * * * * * * *

Order affirmed, with costs, and certified question not answered as unnecessary. Opinion by Judge Fahey. Chief Judge DiFiore and Judges Rivera, Stein, Garcia, Wilson and Feinman concur.

Decided June 11, 2019